# The Commonwealth *vs* Blanton's Executors *et al.*

APPEAL FROM THE GENERAL COURT.

*Escheats.*

CHIEF JUSTICE ROBERTSON delivered the Opinion of the Court.

CHANCERY.

*Case* 129.

*May* 28.

The case stated.

· IN the year 1818, one *Benedict Costy*, an isolated foreigner without heir or distributee, so far as is yet known, died intestate in Franklin county, in this State; and in June of that year, *Carter Blanton* was qualified as administrator of his goods, which were estimated, according to a reported inventory thereof, at about $1150. And that estate seems never to have been appropriated by the administrator unless he applied it, as may be presumed, chiefly to his own use.

2bm893
113  621

2bm393
124  503
124  504

Blanton, the administrator, died in the year 1835, and, by his will, directed his representatives to indemnify his surety in his administration bond against his contingent liability for the fund thus retained and undistributed.

In January, 1840, the Legislature of this State enacted a statute (*Session acts of* 1839–40, *p.* 47,) providing, in substance, that the *"estates"* within this Commonwealth, as to which the owners had previously died or might subsequently die intestate, without legal heirs or distributees, should be vested in the said Commonwealth, *"*without office found,*"* and requiring all executors and administrators of such persons to pay into the public treasury thereof the net balance of such undisposed of property, within one year after the date of the statute, if administration had been granted before its date, or within one year after the date of the letters of administration, if granted since that enactment, and also authorizing suits for settling such estates, and coercing the rights of

Vol. II.                        50

THE COM'TH.
*vs*
BLANTON'S EX-
ECUTORS *et al.*
the Commonwealth through the intervention of agents, to be appointed for that purpose in each county.

In May, 1841, *Alexander Rennick*, who had been appointed the agent for Franklin county, filed an appropriate bill in chancery in the name of the Commonwealth against the executors of *Carter Blanton*, for coercing an account and claiming a decree for the balance remaining in his hands, to be ascertained on proper settlement by the Chancellor—the said executors having, as alleged, refused to make a voluntary settlement or to pay any thing into the Treasury.

Decision of the General Court, and the probable grounds thereof.
The General Court having dismissed the bill upon demurrer, this writ of error brings up that decree for revision.

As the bill contains every essential allegation, the Circuit Judge must have sustained the demurrer on one or both of two grounds. First, an opinion that if no person was entitled under the statute of distributions, the personal estate of the intestate had become vested by operation of law in Blanton in his own beneficial right, and that the Legislature has no constitutional power to divest that right and apply the property to the use of the Commonwealth. Second, such an interpretation of the statute as would restrict it to the unconverted and specific property of intestates in the hands of their representatives.

We will, therefore, consider these grounds in the order in which they have been suggested.

Escheats are the legal fruits of the ancient doctrines of feudal tenure, and are applicable to immovable property alone.
1. *Escheats*, being the legal fruits of the ancient doctrines of feudal tenure, were always applicable, of course, to immovable property alone: movable things never escheated in the technical sense. In England, there has been some diversity of opinion as to the ultimate title to the goods of an intestate after payment of his debts, and when no person appeared who could claim under the statute of distributions. There is no trace of any British statute that can shed any light on that obscure subject. Nor, if we explore the labyrinth of the ancient common law, can we find any sure clue to a conclusion perfectly clear and satisfactory.

Personal administration, and the right to such administration, are altogether statutory. The right to administer on the estate of an intestate is an attribute of the sovereign power. In the days of *Glanvil* and of *Bracton,* when the common law of England was in its seminal state, the King, as *parens patriæ,* had a right to take possession of an intestate's effects and apply them first to the payment of debts, and next to the use of his wife and children, if any, and if none, to his next of kin, and, if none of these, then to the public use. And that prerogative of sovereignty was first exercised through the instrumentality of the County Courts, and, in some instances, was delegated as a franchise to lords of certain manors. But, at a later period, it was vested in the prelacy in confidence, that official piety would devote more beneficially to the intestate's soul the residual third, called "the dead man's part," after allotting the other two thirds to the widow and children to which they were entitled as *partes rationabiles.* The ordinary was expected, of course, to dedicate that third part faithfully to pious uses, and if he failed to do so, *or converted it to his own use, he was guilty of a breach of trust.* But, finding that the ordinaries perverted their trust to their own use, the legislative power, in 1285, enacted the statute of 13*th Ed. I, c.* 19, called the statute of *Westminster the Second,* requiring them to pay the debts of intestates, which, as *Sir Edward Coke* said, was only declaratory of the common law.

To afford a still stronger guaranty against a misapplication and unauthorized conversion of the effects of intestates, the statute of 31 *Ed. III. c.* 11, was enacted, requiring the ordinaries to appoint *administrators* and hold them as *accountable as executors.*

But, in the progress of time, administrators, after paying debts, refused to distribute the residue of the estate committed to their trust. And, although the ecclesiastical courts attempted to enforce distribution, yet, in the case of *Hughes* vs *Hughes (Carter,* 125,) the court of *Common Pleas* enforced a prohibition to the *Court Christian* on the flimsey ground that in granting administration, the ecclesiastical jurisdiction was exhausted.

---

*Margin notes:*

THE COM'TH. *vs* BLANTON'S EXECUTORS *et al.*

Historic outline of the origin of administrations.

Administration and the right thereto is statutory, and an attribute of sovereign power, which in the days of *Glanvil* and *Bracton,* belonged to the King as *parens patriæ,* through the instrumentality of County Courts; afterwards by the prelacy, until the 13 *Edw. I. c.* 19, called Stat. Westminster.

Stat. 31, *Edward III. c.* 11, required the ordinaries to appoint adm'rs and make them accountable as ex'ors.

The state of the law of administrations, at the passage of the 1st statute of distributions, 22 and 23 *Ch. II, c.* 10, which requires distribution among kindred only.

And the temporal courts not venturing to arrogate juris-
diction over administrators, there was thus a temporary
interregnum of judicial authority as to compulsive distri-
bution, until *Sir Orlando Bridgman,* (who, as *Chief
Justice* of the Common Pleas when *Hughes* vs *Hughes*
was decided, had dissented from the majority) determin-
ed to supply, by act of Parliament, the remedy which
the courts doubted their authority to give, and, therefore,
he procured the enactment of the statute of distributions,
22 and 23 *Ch. II, c.* 10.

But that statute only requires distribution among the
intestate's kindred, and is silent as to the disposition of
his effects when there are no such distributees.

This historic outline furnishes the only clue to the as-
sumed right of beneficial property in administrators,
when there is no person entitled under the statute of dis-
tributions. It is evident that the only reason for that
assumption was the defect of prescribed remedy ante-
cedently to the statute of distributions, and the fact that
the statute directs no appropriation in the event of a fail-
ure of kindred.

But the same history shows, as we are inclined to think,
that the temporal court was wrong in withholding reme-
dy when there was a clear right; and that, however this
may be, the King, as the official organ of the public, had
never surrendered his sovereign right as ultimate distrib-
utee in trust for all the people who certainly had more
title than any one of them who was a stranger in blood
to an intestate could be admitted to possess from the
accidental circumstance of being appointed a trustee for
every and any one who might be entitled to the effects of
the deceased. And this deduction seems to be fortified
by a preponderance of British authority.

In cases of in-
testacy and de-
fect of legal rep-
resentatives in
Eng. the King
granted the ef-
fects to the ·or-
dinaries, reserv-
ing a proportion.
In cases of intestacy, and defect of legal distributees,
it seems to have been the practice of the crown to trans-
fer the royal title to the undisposed of effects to the ordi-
nary or an appointee on the King's nomination—reserv-
ing, as the consideration of the grant, a certain reversion-
ary proportion of interest: 11 *Vin. Abr.* 87; *Com. Dig.
Adm. A. Jones* vs *Goodchild,* 3 *P. Wms.* 33; *Doug.*
548. And, in every case of an intestate bastard who,

in contemplation of law, had no kindred, the King, as *ultimus hæres*, is admitted to be entitled, at his election, to the effects after payment of debts. In the case of *Middleton* vs *Spicer*, 1 *Brown's Chancery Rep.* 201, the *Chancellor* reviewed the authorities on this whole subject, and decided that a personal representative, *who was only a trustee*, never acquired a beneficial title to an intestate's effects in consequence of a failure of distributees; but that, in the event of such failure, the surplus, after payment of debts, was held in trust for the King: and he said, moreover, that the royal right in such a case was not, (as in the case of an escheat, as decided in *Burgess* vs *Wheat*, 1 *Eden.* 259,) *seignioral* but *prerogatival* merely.

The same doctrine was virtually reiterated and confirmed in the case of *Barclay* vs *Russell*, 3 *Vez.* 424.

And each of those cases overrules, as an unauthorized dictum, the suggestion in 2 *Salk.* 37; that the property of an intestate was beneficially in the ordinary, and recognizes the converse as declared in 2 *Inst.* 398.

We should be inclined, therefore, strongly to the conclusion that, according to the common law as now understood in England, an administrator has no indefeasible beneficial title to his intestate's effects merely because there are no distributees under the statute of distributions.

Until the enactment of a statute in the reign of *William IV.* an executor, in consequence of an assumed intention of the testator to that effect, was considered entitled to the unbequeathed surplus, unless, by giving him some other legacy or otherwise, the testator had manifested the intention that he should be a trustee only. But, before that enactment, the courts of England decided in many cases that, whenever there was ground for presuming that the testator did not intend that his executor should be implied legatee of the unbequeathed residue of his goods, the King, (as trustee for his subjects,) and not the executor, was entitled to that residue if there was no legal distributee.

And we can perceive no reason for discriminating, as to the matter between a trustee nominated by the tes-

Before the statute *Wm. IV.* the courts of England gave to the King the residue of the goods of a testator, wherever there was ground to presume the testator did not intend that the executor should have them.

And there exists no reason for a distinction be-

THE COM'TH.
    vs
BLANTON'S EX-
ECUTORS et al.

tween a trustee
appointed by the
testator and one
appointed    by
law.

tator and a trustee appointed by public authority or the law. This public right may not have been generally enforced, and tacit forbearance may have induced an opinion that what administrators had not been required to surrender they had a legal right, beneficially, to hold and enjoy as their own. Indeed it may be truly said that, until the public right is asserted, the administrator *is* entitled to the effects and may consider and use them as his own, there being no statutory distributee.

This subject was touched by this Court in *Conclude* vs *Williamson et al.* (1 *J. J. Marsh.* 18,) and it was there said, that the title remained in the administrator until divested by the Commonwealth; but the Court carefully withheld any opinion on the question whether that title was of such a character as to preclude any claim to, or disposition of, the property by the Commonwealth.

However, the Court, when that case was decided, was not aware of a local authority which we have since found, and which concludes all question upon this point here, whatever may be the doubts or the doctrines elsewhere. We allude to two ancient statutes of the colony of our parent State, *Virginia*, and which, never having been repealed, so far as we have been able to ascertain, were adopted as the law of Kentucky by our State constitution.

The statute of
the colony of
Virginia of 1655,
6th year of the
Commonwealth,
and 1661, 14
Ch. II, that of
1711, 9 Anne,
quoted and con-
sideied as decla-
rative of the
common law.

In March, 1655, and sixth year of the Commonwealth of England, the colonial Legislature of Virginia enacted, "that, if any administrator be of no kin and have assets, "all the estate left after debts be paid be *employed in the* "*county where he lived for setting up of manufactures* "*or for other publique vses*, the administrator being paid his reasonable charges and for his *paynes:*" (1 *Vol. Henning's Statutes at large, p.* 401.)

And in March, 1661-2, (14 *Charles II*,) the same Legislature enacted that, after payment of debts, "the sur-"plusage, if any remayning, (if there be no widow or "child,) be delivered to the next kinsman of the dece-"dnet, if he appears, and if none prove himself such "within three years, *then the Court to give an account of* "*the said surplusage to the assembly, who are to dispose* "*of the same to the use of the country*, allowing to the

"Court or whom they intrust with the management of *itt*, "for his reasonable costs and paynes."

And an act of November, 1711, (9 *Anne*,) requires administrators to give bond with a condition, among other things, "to pay to such person or persons as *the County* "*Court Justices shall direct, pursuant to the laws in that* "*case made and provided.*"

These enactments may have been understood as declaratory of the law of England, and if so, they were intended chiefly to vest, without doubt, in the colony what otherwise might perhaps have been claimed by the crown. But however this may have been, the colonial statutes of 1655 and of 1661, gave the *quietus* to all legal claim by an administrator to the effects of his intestate, on the failure of kin, if the colony or Commonwealth (as it afterwards became,) elected to assert its right. The ultimate right of the administrator in such a case, was, therefore, altogether contingent, depending wholly on the legislative forbearance or renunciation.

The Legislature of Kentucky, after declaring, by a statute of 1798, that slaves should be deemed real estate, added this proviso: "that no such slave shall be liable to "be *escheated* by reason of the decease of the proprietor "for the same, without lawful heirs, but all such slaves "shall, in that case, be accounted and go as chattels and "other personal estate."

That proviso might possibly be considered as implying that, in the opinion of those who enacted it, personal property did not relapse to the Commonwealth either by escheat or otherwise; and this interpretation we were ourselves once rather inclined to give to it. But it is not, as we now believe, entitled to any such effect. As already suggested, movables never *escheated*. And, in order to escheat land, a judicial proceeding was necessary; and the title never vested in the Commonwealth until after office found. Escheators also were required to be appointed. Then, as slaves, when personal estate in law as well as in fact, belonged to the Commonwealth without the contingencies, circuity, and expense of an inquisition, the Legislature very properly declared that the technical conversion of that kind of property into real.

THE COM'TH.
*vs*
BLANTON'S EX-
ECUTORS *et al.*

The statute of 1798, making slaves real estate, and its proviso, that they should not escheat, does not necessarily imply that movable property where there is a defect of heirs does not belong to the Commonwealth, without office found: but only to say that they, by being made real estate for certain purposes, should not be subjected to the circuitous process of an inquisition, &c. to secure the rights of the Commonwealth.

THE COM'TH.
vs
BLANTON's EX-
ECUTORS et al.

estate, should not change or embarrass the ultimate right of the Commonwealth, on a failure of distributees, by making it depend on an office found; and, therefore, it was provided that slaves should not be "liable to be *escheated*," but should go as chattels, that is, at once without the intervention of escheators or inquisitors. This is now our construction of that proviso. We cannot believe that the Legislature of 1798, intended that administrators should be entitled, absolutely, to the slaves of persons who died intestate, without legal distributees, or intended, by implication or otherwise, to repeal the preexisting law recognizing the right of the Commonwealth, and providing for securing the enjoyment of it by requiring reports from the County Courts of all such estates.

The statute of 1840, not unconstitutional, but only as asserting a long neglected but indisputable right.

From the foregoing conclusions, the deduction is inevitable that the statute of 1840 cannot be liable to the charge of attempting, unconstitutionally or unjustly, to divest any indefeasible or meritorious right, but should be considered as having the effect only of asserting and securing an indisputable, but long neglected and dormant right in the Commonwealth. That right, resulting as a trust for the whole people, cannot be considered as having been abandoned or lost by desuetude or vested absolutely and beneficially in the administrator, who took the intestate's property in trust for the ultimate successor, and not for his own use or benefit.

The statute of 1840 pointed out the mode of recovering the rights of the Commonwealth, where there is a defect of heirs, & is not to be confined in its operation to the specific thing, coming to the hands of an administrator, but the value of the thing converted by the administrator is recoverable by the Commonwealth from the administrator, without regard to lapse of time.

2. As there yet seems to be no statutory distributee of *Costy's* goods, the Commonwealth, rather than the administrator, was entitled to them, before and independently of the act of 1840. And, the right existing, the prescribed and adopted remedy may be applied, whether the letter of the statute embraces such a case or not. But we are of the opinion that the literal import of the enactment embraces this case. It undoubtedly has a retrospective operation. What limit is prescribed to the retroaction? It certainly embraces administrators who had converted the assets by sale; for *it* requires them, after settlement of their accounts, to pay into the treasury any balance "*of cash*" which may be found in their hands. It cannot, therefore, be restricted to estates in kind, before any administration of them, but applies to

all unappropriated balances, without regard to their specific quality or to lapse of time.

Nor can Carter Blanton's death be deemed material to the right of the Commonwealth to maintain this suit. It was the duty of his executors to settle and account when required to do so, as they were, by the public agent; and surely the accidental death of an administrator, whether before or since the enactment of 1840, cannot entitle his representatives to that to which he himself would have had no title had he survived. The statute applies to the case.

It may not be improper to add that, as Blanton was contingently liable to the Commonwealth when he executed his fiducial bond, his sureties in that bond may also be liable to the same extent, if his estate should be insufficient. The Commonwealth was ultimate distributee according to the law in force at the date of the bond. Having asserted her claim and prescribed a mode of enforcing it, the sureties cannot say that a new and unreasonable burthen has been thereby imposed, nor that it is not embraced by the condition of their bond, stipulating for an account and payment, by their principal, to whomsoever he might be liable.

Nor is it material to the question of liability in this case, whether the administrator had converted the assets to his own use or retained, at his death, the unappropriated balance in money. In either event he was liable to the Commonwealth when she might elect to assert her claim; and his executors are equally liable so far as assets of his estate have come to them.

It is, therefore, the opinion of this Court, that the demurrer ought to have been overruled and the defendants required to answer the bill.

Decree reversed and cause remanded for further proceedings.

*Cates, Att. Gen.* for Commonwealth; *Owsley & Goodloe and Todd* for appellees.

---

THE COM'TH.
*vs*
BLANTON'S EX-
ECUTORS *et al.*

And the adm'r. or ex'or. or other representatives of the person who has thus received and converted property is responsible to the government to the extent of assets, and the sureties of the executor or administrator to the same extent,