GEORGE W. JOHNSTON *v.* HENRY SPICER et al., Appellants; FRANCIS SPICER et al., Respondents.

Ante-nuptial contracts intended to regulate and control the interest which each of the parties to the marriage shall take in the property of the other during coverture or after death, are favored by the courts and will be enforced in equity according to the intention of the parties.

In order to effectuate such intention courts of equity will impose a trust upon the property agreed to be conveyed, commensurate with the obliga- tions of the contract.

It is immaterial whether a trustee is appointed in the contract or not, or whether the property agreed to be conveyed be then owned by the parties, or is expected to be subsequently acquired.

The contract also will be enforced in equity to accomplish the object the parties had in view, without reference to the validity of the agreement at law.

All rights of property, of whatever nature, revert to the People when the owner dies intestate and there is a failure of heirs to take such property. In respect to the rights so acquired by the State there is no essential difference between real and personal property, although the doctrine of escheat applies only to legal estates and does not, in a strict sense, affect either equitable estates or personal property.

The history of legislation in this State upon the subject of escheat and the administration of the estates of persons dying intestate without heirs, given.

By an ante-nuptial agreement between G. (the man) and E. (the woman), G. covenanted and agreed that, in case of his death, without leaving lawful issue by the contemplated marriage, previous to the death of E., all of the real and personal property, of which he should die possessed, should belong to her. The parties intermarried, but had no children, and G. died intestate seized of certain real estate, upon which was a mortgage. E. died thereafter intestate, leaving no lawful heir. In a controversy as to the right to the surplus money arising on foreclosure sale *held*, that upon the death of G. the legal title to the real estate went to his heirs; but that by force of the marriage settlement, E. became the equitable owner, and a trust by implication arose in her favor; the heirs holding the title as a naked trust for her and subject to her right to be vested with it on demand; and that upon her death without heirs her interest and rights reverted to the State, and it was equitably entitled to the surplus.

Certain of the heirs of G. procured the passage of an act (Chap. 377, Laws of 1885), entitled "An act to release the interest of the People of the State of New York in certain real estate to * * * (said heirs), and for other purposes." Its first section purports to release to the persons named in the title the interest which the State acquired by escheat in certain real estate described. The second section assumes to release to said persons all the interest which the State has in the personal property, of which E. died possessed of, or was entitled to. *Held*, that the act was violative of the provision of the State Constitution (art. 3, § 16), which declares "that no private or local bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in the title."

Also, *held*, that the heirs of G. having the legal title to the property, and so presumably being in possession thereof at the time of the passage of the act, had the right to maintain their title and possession against all except E., or those who had lawfully succeeded to her rights; and so, those not named in the act were entitled to raise the objection that it did not vest those rights in the grantees from the State.

(Argued June 7, 1887; decided October 18, 1887.)

APPEAL by Henry Spicer and others, defendants, from order of the General Term of the Supreme Court in the first judicial department, made December 31, 1886, which reversed an order of Special Term directing as to the disposition of surplus money arising on foreclosure sale herein.

The material facts are stated in the opinion.

*Edward F. Brown* for appellants. Marriage settlements were assumed by the legislature, in making the revision of

1830, as an existing mode of providing for the necessities of families. (Willard on Real Estate, 274; 1 R. S. 727–732.) All such contracts made before 1849 remain in full force. (Laws of 1849, chap. 375, § 3.) Such contracts are founded on the consideration of marriage, which is a good and valuable consideration. (*Bradish* v. *Gibbs*, 3 Johns. Ch. 523; *Wright* v. *Wright*, 54 N. Y. 440.) In England after-acquired property may be settled by the parties. (*Smith* v. *Osborne*, 6 H. L. C. 375; *In re Pedder*, 10 H. L. Eq. 585; Notes to Story's Eq. Jur. §§ 983, 984; Banning on Mar. Set. 80, 172, 179.) In the United States after-acquired property may be settled. (*Strong* v. *Skinner*, 4 Barb. 546; *Merritt* v. *Scott*, 6 Ga. 563; *In re Young* v. *Hicks*, 92 N. Y. 238.) Courts must carry into effect the intention of the parties to every instrument purporting to convey an interest or authorizing the creation of an interest in real estate. (2 R. S. 748, § 2; *Darling* v. *Rogers*, 22 Wend. 489; 2 Kent's Com. 165.) Marriage settlements are express trusts. (Story's Eq. Jur. § 981.) Although marriage articles are generally executory, settlements are executed trusts. (50 Amer. Dec. 374, *n.*; 1 Fonbl. Eq. R. Ch. 6, § 7; Bouvier's Inst. § 3947; Story's Eq. Jur. § 983.) The *ante-nuptial* agreement to confer title of real estate to wife will be enforced as if there had been a formal conveyance. (*Beardsley* v. *Hotchkiss*, 96 N. Y. 217.) No trustee was necessary. (*De Barante* v. *Gott*, 6 Barb. 492; *Strong* v. *Skinner, supra.*) Equity would treat the husband as trustee. (*Blanchard* v. *Blood*, 2 Barb. 352; Story's Eq. Jur. § 1380; 2 Kent's Com. 162, 171, 172; *Strong* v. *Skinner, supra; Bradish* v. *Gibbs*, 3 Johns. Ch. 522.) Trusts in real or personal property may now be proved by any writing signed by the party declaring the same. (*Cook* v. *Barr*, 44 N. Y. 156; *Peck* v. *Vandemark*, 99 id. 29.) The contention that the real estate in question descended to the heirs of George Spicer, because the settlement was not executed in the form of a will, cannot be sustained. (*Hathaway* v. *Payne*, 34 N. Y. 92; 1 R. S. 754, § 21; 2 Kent's Com. 165.) Though an instrument is void at law, it does not follow that it may not

be enforced in equity. (*Laut's Appeal*, 95 Penn. St. 279; *Sanders* v. *Miller*, 79 Ky. 517; *In re Youngs* v. *Hicks*, 92 N. Y. 238; *Shephard* v. *Shephard*, 7 Johns. Ch. 86.) Ante-nuptial agreements in favor of the wife have always been favored in equity. (*In re Youngs*, 27 Hun, 54.) The objection that this was a mere possibility or expectancy, and, therefore, not assignable is untenable. (*Lampet's Case*, 10 Rep. 48; Powell on Mortgages, 17 note by Coventry; *Field* v. *Mayor, etc.*, 6 N. Y., 187; 2 Spence Eq. Jur. 865; *Stover* v. *Eycleshimer*, 4 Abb. Ct. App. Dec. 309; Story Eq. Jur. § 1040; Atherley Mar. Set. 58; *Miller* v. *Emans*, 19 N. Y. 390; *Edwards* v. *Varick*, 5 Den. 682.) Equity regards that as already done, which parties have agreed should be done, and which ought to have been done. (*Lanning* v. *Thompkins*, 45 Barb. 316; Story's Eq. Jur. § 64 *g*.) The intent generally is to secure a provision for the issue which neither the parents nor creditors of the husband can defeat. (Willard on R. E. 272; Story Eq. Jur. §§ 983, 984; *Wetmore* v. *Kissam*, 3 Bosw. 331, 336.) The land in question would have descended to Mrs. George Spicer's heirs, by virtue of the law converting formal trusts into legal estates; if not under the statute as to descendability of expectant estates. (1 R. S. 754, § 21.) Mrs. Spicer left no heirs. The proof thereof was sufficient. (*Jackson* v. *Etz*, 5 Cow. 314.) The State, therefore, succeeded to her rights. (Const. art. 1, § 11.) An estate in fee was conveyed to Mrs. Spicer. (*L. I. R. R. Co.* v. *Conkling*, 29 N.Y. 572; 1 R. S. 748, § 1.) Without even recourse to the rules of equity, the grant to Mrs. George Spicer is binding on the heirs of her husband. (1 R. S. 739, § 143.) Chapter 377, Laws of 1885, releasing the rights of the State to certain relatives of George Spicer, is constitutional. (*People* v. *Super. of Chaut. Co.* 43 N. Y. 10; *In re De Vancence*, 31 How. Pr. 289, 343; *People* v. *Canal Board*, 55 N.Y. 390; *Roosevelt* v. *Godard*, 52 Barb. 533; *People* v. *Bennett*, 54 id. 480; *People* v. *Super. of Orange*, 17 N. Y. 235.)

*Charles DeKay Townsend* for respondents. Ellen Spicer's sole remedy would seem to have been an action against the

administratrix of her husband for a failure to perform his agreement. (*Peck* v. *Vandemark*, 99 N. Y. 29; *Sherman* v. *Butts*, 1 Abb. [N. C.] 20, *n.*) Chapter 377, Laws of 1885, under which respondents' claim is unconstitutional, being in violation of the sixteenth section of the third article of the Constitution, being both a private and a local act. (*In re N. Y. El. R. R. Co.* 70 N. Y. 350; *In re Church*, 92 id. 4; *People* v. *Super. Chaut. Co.* 43 id. 10; *Kerrigan* v. *Force*, 68 id. 383; *Gaskin* v. *Meek*, 42 id. 186; *In re Sackett*, 74 id. 102.)

RUGER, Ch. J. The controversy in this case arises, among the heirs of one George Spicer, over the distribution of surplus moneys accruing from a sale of lands under a mortgage foreclosure, and depends for its settlement mainly upon the effect to be given to a contract made between Spicer and one Ellen Dounagha on June 29, 1847, in contemplation of their marriage.

The appellants claim as legal heirs of George Spicer, and the respondents, who were also a portion of his heirs, claim the exclusive right to these moneys by virtue of a release from the State, of the interest said to have accrued to it by escheat, on the death of Ellen Spicer. The marriage contract was executed by George Spicer, as party of the first part, Ellen Dounagha, as party of the second part, and Peter Crawford of the third part. The party of the second part thereby conveyed certain real and personal property to Crawford in trust for her own use and benefit, and the contract then provided as follows: "It is hereby further covenanted and agreed, that in case of the decease of the party of the first part, without leaving lawful issue by the contemplated marriage, previous to the decease of the party of the second part, that then and in that case all of the real and personal property he may die possessed of, shall belong, and be the property of the party of the second part; and that, also, in case the party of the second part should die without having lawful issue by the said contemplated marriage, the property, both real and per-

sonal, shall belong and be the property of the party of the first part; and the trustee shall, by good and sufficient conveyance or conveyances, assign the same to the said party of the first part." The parties subsequently married but had no children. Spicer died, intestate, on July 1, 1884, seized of the lands out of which the surplus moneys arose, and leaving his widow surviving and numerous heirs-at-law. The widow died in January following, intestate, and leaving no lawful heir. Upon the theory that the marriage settlement established a right in the widow to such real estate, which escheated to the State upon her death, the respondents procured the passage of chapter 377 of the Laws of 1885, the escheat bill already mentioned, and by reason of the interest thereby acquired, assert an exclusive right to the moneys in dispute.

The referee and the Special Term sustained the claims of the State's grantees under the statute, but the General Term reversed the orders awarding them the surplus moneys, and directed them to be distributed among all of the heirs-at-law of George Spicer, deceased. The theory upon which that count proceeded was that the marriage contract, so far as George Spicer's property was concerned, was designed to operate only upon a mere possibility which was not at common law the subject of a grant, and, therefore, no interest in the property passed under the contract to the widow, and none escheated to the State upon her death. It was assumed that a mere right of action to recover such land, would not escheat upon the death of its owner, and, therefore, third persons would take no interest in the land by virtue of a grant thereof from the State.

We are inclined to the opinion that the General Term erred in some respects in its view of the case, and that upon the death of George Spicer, his widow became by force of the marriage settlement the equitable owner of the real estate, and upon her death, without heirs, her interest therein reverted to the State, though not technically by escheat. No express trust was created by the marriage contract, but a trust by implication, in the property left by him, arose upon the death

of George Spicer in favor of his widow. The legal title which was vested in him descended to his heirs at his death, by force of the statute of descents, and was held by them at the death of the widow. It did not vest in the widow by virtue of the contract under section 47 of the statute of uses and trusts, as that section is controlled by section 50, which provides that it shall not apply to trusts arising by implication of law. Neither was it affected by section 21 (3 Rev. Stat. [7th ed.] 2213), as that relates only to the express trusts authorized by the statutes and does not include such as are created by implication or intendment of law, and the descent of these lands would not therefore seem to be affected thereby. The property intended to be settled on the wife was such only as the settlor should die possessed of, and there would therefore, seem to be some difficulty in treating the husband during his lifetime, as trustee for his wife, since he had an undoubted right of disposition of the property during that time, and the equitable right of the wife arose only upon his death.

It would, therefore, seem that upon the death of George Spicer, the legal title to his real estate descended to his heirs, but they held it in trust for the equitable owner, and subject to her right to become vested with the title upon demand. (*Giddings* v. *Eastman*, 5 Paige, 561; *Wood* v. *Mather*, 38 Barb. 473, 479.) Ante-nuptial contracts, by which it is attempted to regulate and control the interest which each of the parties to the marriage, shall take in the property of the other, during coverture or after death, like dower, are favored by the courts and will be enforced in equity according to the intention of the parties whenever the contingency provided by the contract arises. (2 Kent's Com. 165; *Matter of Youngs*, 27 Hun, 54; affirmed, 92 N. Y. 235.)

No especial formality is requisite in such instruments, and, in order to effectuate the intentions of the parties, courts of equity will impose a trust upon the property agreed to be conveyed commensurate with the obligations of the contract, or will decree their specific performance, and when such relief is inadequate or impracticable from the situation of the property

or the character of the contract, will award damages for its breach. (*De Barante* v. *Gott*, 6 Barb. 496; *Peck* v. *Vandemark*, 99 N. Y. 29; Pomeroy's Eq. Juris. §§ 1297, 1403; Schouler on Domestic Relations, 263–266 *et seq ; Pierce* v. *Pierce*, 71 N. Y. 154, 156.) It is entirely immaterial whether a trustee, to carry it into effect, has been appointed in the contract or not, or whether the property agreed to be conveyed be then owned by the parties, or is expected to be subsequently acquired, if the contract is fair and reasonable and such as it is lawful for the parties to make, and the rights of creditors or third persons have not intervened, it will be enforced in equity in such a manner as to accomplish the object which the parties had in view, without reference to the validity of the agreement at law. (*Blanchard* v. *Blood*, 2 Barb. 354; *De Barante* v. *Gott*, 6 id. 496; Schouler's Domestic Relations, *supra ;* Atherley on Marriage Settlements [London, 1813], 58.) The rule, as stated by Pomeroy in his work on Equity Jurisprudence is : " Among the agreements which the original common law treated as invalid irrespective of statutes, but which equity in the application of its conscientious principles regards as binding and enforces by granting its relief of specific performance, are the following : Agreements for the assignment or disposition of a possibility, expectancy or hope of succession ; agreements to assign things in action ; executory agreements made between a man and a woman who afterwards marry, which then became absolutely void at common law, but which equity may specifically enforce against either husband or wife at the suit of the other." (§ 1297.) (See *Stover* v. *Eycleshimer*, 46 Barb. 84.)

It is said in Bright's Husband and Wife (pp. 471 *et seq*), " a jointure which has been agreed by the husband before marriage to be made upon his intended wife will be good in equity although it be not actually so settled, but is permitted to remain in articles, or upon the husband's covenant ; for such a jointress being a purchaser of the provision by the marriage, is entitled in that character to the aid and protection of a court of equity ; accordingly such articles or covenant will be

specifically performed." He further says that "in *Tooke* v. *Hastings* (2 Vern. 97), where A. covenanted to settle lands of a certain value, and had no land at the time, but afterwards purchased land, it was held that such land should be liable." * * * "The principle laid down by Lord Redesdale is this: 'That where a person acts for valuable consideration, as upon marriage, he is understood in equity to engage with the person with whom he is dealing, to make the instrument as effectual as he is able; and whenever that is the case, there is nothing in any of the authorities to raise a doubt that it shall have effect, so far as the person executing it has the power; and where the nature of the instrument is contrary to what the power prescribes, but demonstrates an intent to charge, it shall have the operation of charging in that form which the power allows.' It follows, therefore, that however the intent be shown, if it be in writing, the court will, in aid of the intention, supply the defects in the mode of execution in favor of the jointress; so that whether the intent to execute the power be by letter, memorandum, will, articles or covenant, a court of equity will aid the jointress, and supply all omissions." In the case of *De Barante* v. *Gott* (*supra*), an ante-nuptial contract had been executed between the plaintiff, who resided in France, and his intended wife living in New York, whereby it was provided, that in case of the death of the wife without leaving children, all her personal estate should become vested in her husband, and the real estate of which she should die seized, in the United States, should be immediately sold and the price thereof remitted to the plaintiff. Upon a bill filed by the husband to recover the real and personal property from the persons in possession, Judge Harris held that, if the instrument which created the right of the plaintiff in the property "had also appointed a trustee to carry into effect the object, as in the case of *Craig* v. *Leslie,* no one I apprehend would have doubted the authority or duty of such trustee to sell the real estate and remit the proceeds; but it is a rule of equity, which is said to admit of no exception, that it never wants a trustee. It is the

settled doctrine of equity that no trust shall be permitted to fail for the want of a trustee to execute it.    Land to which a trust is attached remains chargeable with such trust in the hands of the heir or devisee.    A court of equity will always establish and enforce a trust whenever a competent party applies for its aid, and presents a case entitling him to relief." * * * "The general rule as stated by Story (2 Eq. Jur., § 976), is that wherever a trust exists, either by the declaration of the party, or by intendment or implication of law, and the party creating the trust has not appointed any trustee to execute it, equity will follow the legal estate, and decree the person in whom it is vested to execute the trust."    The heirs at law being infants it was directed that a referee be appointed to sell and convey the real estate and pay the proceeds to the plaintiff.

In *Peck* v. *Vandemark* (99 N. Y. 29) it was held that an ante-nuptial agreement was established by the letters of the parties to the effect that the intending husband would, in case the plaintiff intermarried with him, make provision by giving her by will one-half of his property, and the use of the other half for her life.    The parties having intermarried and the husband failing to make the provision agreed upon, it was held that this was a valid contract binding upon the testator, and the plaintiff could maintain an action against the executor to recover damages for the violation of the contract.    The damages were held to be the value of one-half of the estate, both real and personal, absolutely, after paying debts and expenses of administration, and the use of the other half during her life.

It has been the constant practice of the courts of this country, as well as of England, to enforce ante-nuptial agreements according to their terms, whether they relate to existing or after-acquired property, and to decree a specific or substituted performance of them according to the nature of the case.    (2 Kent's Com. 172 ; 2 Story's Eq. Jur. §§ 775, 1370 ; *Bradish* v. *Gibb*, 3 Johns. Ch. 523 ; *Reed* v. *Livingston*, 3 Johns. Ch. 481 ; Pom. Eq. Juris. §§ 1297, 1403 ; *Smith* v. *Osborne*, 6 H. of L. Cas. 375 ; *In re Pedder*, 10 L. R. Eq. 585 ;

*Hammersley* v. *Bonan De Biel*, 12 Cl. & Fin 45; *In re Wilson's Exrs.*, 2 Barr, 325.)

These cases do not proceed upon the theory of a grant conveying a present interest in the property, but upon that of a contract intended to provide, in case of the death of one of the parties, an adequate provision for the support of the other, and, which, as they are founded upon a valuable consideration and not prohibited by public policy or principles of law, it would be inequitable to defeat or destroy. (2 Kent's Com. 165; Schouler's Dom. Rel. 263.)

The suggestion that such contracts may be invalid, as being of a testamentary character and as contravening the statutes regulating the execution of wills, is of no force, in view of the fact that for many centuries they have been sanctioned and protected by the courts, and their validity in this State has been expressly ratified and approved by statutory provisions.    (Laws of 1848, chap. 200, § 4; Laws of 1849, chap. 375, § 3.)   Here the contract is clear and explicit, that in case of Spicer's death before that of his wife all of the property, both real and personal, of which he should die possessed, shall belong to and be the property of his widow. In the case of the wife, her property was conveyed by the marriage articles to a trustee, who was directed, in the event of her death before that of her husband, to convey it to him, and nothing further remained to be done on the part of the wife to perfect the title of the husband in the contingency provided for.   It cannot be doubted but that it was the intention of the parties, in case of the death of either, to vest the survivor with similar interests in the property of the other; and that the omission to provide in the articles for the method of transfer by the husband was occasioned by the fact that no property had then been acquired by him, or for some other sufficient reason.   His covenant, however, is express — that his property shall belong absolutely to her in the event of his death without issue; and equity will enforce the covenant for the benefit of the widow so as to effectuate the intention.

It does not appear in the case at what time the sale of the

land under the foreclosure proceedings took place, nor the time when the title of the heirs to the real estate became divested by its sale, and converted from an interest in real property to that of one in personal property. Neither does it seem to us, in the view we take of the case, that this question is material. If the heirs became vested with the legal title on the death of George Spicer, they would retain a similar interest in the proceeds thereof which had, without any agency of theirs, been converted from real into personal property. At all events if this circumstance was material, there is no evidence in the case which enables the court to determine what the fact was, and we must deal with the case upon the facts contained in the record. The remaining question on this branch of the case has reference to the disposition which the law makes of the widow's equitable interest in the event of her death, before acquiring the legal title.

The respondents assert that no claim is made that rights of action escheat to the People, and such seems to have been the theory entertained by the General Term. In the strict sense of the term escheat, perhaps, this may be so, but we assume it to be the law in this State that all rights of property, of whatever nature they may be, revert to the People when the owner dies intestate, and there is a failure of heirs or next of kin, to take such property. We believe it to be the established rule in all civilized countries that, in such cases, the property of a resident dying intestate without heirs, reverts to the Sovereign or State, to be administered for the general benefit of the community in which he dies. While there is an absence of specific statutory authority declaring the rights of the State in such property, it is believed to be the uniform practice for it to assume by force of natural law, the control of such property, and to administer it for the benefit of those concerned, and, in the absence of any legal heir, to appropriate the proceeds to the uses of the State.

It is said, in 4 Kent's Commentaries, 425, "It is a principle which lies at the foundation of the right of property that, if the ownership becomes vacant, the right must necessarily sub-

side into the whole community in whom it was originally vested when society first assumed the elements of order and subordination." In a note, it is stated, " the escheats spoken of in the text relate exclusively to land, movables never escheated in the technical sense ; and if the owner died intestate and left no lawful representatives, the personal estate remained at the disposition of the crown. In this country it must vest in the State, and so the statute law in some of the States has specially provided." In Perry on Trusts (§ 327), it is said that it was held in *Burgess* v. *Wheate* (1 Ed. 177), " that if the *cestui que trust* left no heirs, the trust estate did not escheat, but that the trustee thenceforth held the estate discharged of the trust." " This is upon the principle that there is no want of a tenant to the land, the trustee being clothed with all the rights of ownership, against all the world except the *cestui que trust* and those claiming under him. But this principle does not apply to chattels where there can be no tenant, nor to leaseholds, nor to an equity of redemption. In the United States, trustees would hold personal property subject to the right of the State as *ultima haeres* in case the *cestui que trust* died without heirs or next of kin, and it is conceived they would hold real estate under the same rule." Washburn on Real Property (vol. 3, p. 49) says : " While escheat was regarded as an incident of feudal tenure, it did not extend to the equitable estates of *cestui que trust*, and, by analogy, it is generally understood that if a *cestui que trust* dies intestate, without heirs, the trust fails, and the trustee holds an absolute estate in the property free from the claim of any one. But it is settled by the courts of Maryland, and intimated by Judge KENT in respect to New York, that such would not be the case under the statutes and that if a *cestui que trust* should die without heirs, his equitable estate would escheat to the State."

A very elaborate discussion of the history and origin of the right of the State to appropriate the property of a person dying intestate, without heirs, in Kentucky, is contained in the case of *Commonwealth* v. *Blanton* (2 B. Mon. 393). It is there said that the right to administer upon the estate of an

intestate is an attribute of sovereign power, and it was held that an action on the part of the State to recover the assets of an intestate, dying without legal heirs, remaining in the hands of his administrator, could be maintained.

In a note to section 990 of Pomeroy's Equity Jurisprudence the author says : " When the trust is personalty, on the death of the beneficiary, intestate and without any next of kin, the crown or the State succeeds to his property upon other grounds than that of common-law escheat, citing many authorities.

If we turn to the legislation of this State we shall find that the subjects of escheat, and the administration of estates of persons dying intestate without heirs, have generally been treated together as analogous, and result in the appropriation by the State of all such property both real and personal. The first act we have been able to discover is chapter 35 of the Laws of 1792, entitled " An act concerning escheats." That act provides, in all cases " where administration hath been, or hereafter shall be, granted to any person or persons not the widow of or not of kin to the intestate, and no person hath or shall, within one year after granting the letters of administration, appear to claim the ·personal estate of such intestate as next of kin, then, and in every such case, the administrator or administrators shall pay the amount of the personal estate, after deducting the debts and funeral charges of the intestate, into the treasury of the State." In case the administrator neglects to obey this requirement the attorney-general is authorized to bring an action in the name of the State to recover the amount. By the second section it was provided " that whenever the attorney-general shall be informed * * * that any person has died seized of any real estate within the State without making any devise thereof, and leaving no heir capable of inheriting the same," he shall take proceedings in the name of the State to recover the same, and upon recovery thereof it shall be sold by the State and the proceeds thereof paid into the treasury of the State.

The provisions of this act were substantially re-enacted under the same title by chapter 73 of the Laws of 1801, and

also by chapter 19 of the Revised Laws of 1813. No material change in legislation on this subject was made until the revision of the statutes in 1828, when these subjects were separately treated and a new system was adopted for administration upon the estates of such persons.

Chapter 1, title 1, article 1 of part 2 of the Revised Statutes provides that: Section 1. The people of this State in their right of sovereignty are deemed to possess the original and ultimate property in and to all lands within the jurisdiction of the State, and all lands the title to which shall fail from a defect of heirs, shall revert or escheat to the people. Section 2. All escheated lands, when held by the State or its grantees, shall be subject to the same trusts, incumbrances, charges, rents and services to which they would have been subject had they descended; and the court of chancery shall have power to direct the attorney general to convey such lands to the parties equitably entitled thereto according to their respective rights or to such new trustee as may be appointed by the court" Section 1977 of the Code of Civil Procedure provides for the enforcement of these provisions.

The subject of administration upon chattels and personal property was regulated by article 2, title 6, chapter 6, part 2, Revised Statutes (3 R. S. [7th ed.], 2319, *et seq.*), whereby it was provided that "the county treasurer, in each of the counties of the State, shall, by virtue of his office, have authority to collect and take charge of the assets of every person dying intestate, when such assets shall amount to $100 or more, either in his county or out of it, upon which no letters of administration shall have been granted in the following cases: 1st. Whenever such person shall die, leaving assets, in the county of the treasurer, and there shall be no widow or relative in the county entitled or competent to take letters of administration on such estate. 2d. Whenever assets of any person so dying intestate shall, after his death, come into the county of such treasurer, and there shall be no person entitled or competent to take administration of such estate." The act after providing for the manner in which he shall dis-

charge his duties and convert the estate into money proceeds (§ 71), "The balance of any money in his hands shall be paid into the treasury of the State for the benefit of such persons as shall be entitled to receive the same." The statutes also provide for the appointment of a public administrator in the city of New York, who has the exclusive right to administer in the cases referred to, and who is directed to pay into the city treasury all moneys arising from such estates except such as may be paid out and expended in the process of administration.

In the Constitution of 1846 the matter of escheats was made the subject of express provision, and it was enacted that "all lands the title to which shall fail from a defect of heirs shall revert or escheat to the people." (Const. art. 1 § 2)

From this review of the law it would seem that there is no substantial difference between real and personal property in respect to the rights acquired by the State, upon the death of its owner, intestate, without heirs or next of kin. A clear deduction from the authorities seems to lead to the conclusion that the doctrine of escheat applies only to legal estates and does not in a strict sense affect either equitable estates or personal property. It seems also to follow from the authorities cited, that upon the death of Ellen Spicer the State took not the land, but succeeded to the equitable right which she had to a conveyance thereof. This right may possibly be subject to the claims of creditors, or other equities which would have to be adjusted in an action, by the equitable owners to recover the possession of the land.

The omission in the provisions of the Revised Statutes of the words "died seized of" as contained in the Revised Laws of 1813, relating to escheats is not supposed to have effected any change in the law as the revisors say in their note to this section that it is "new in terms but implied in Revised Laws (380, § 2)." A new rule, however, was intended to be introduced by section 2 of the Revised Statutes, which provides that all escheated lands shall be held by the State or its grantees subject to the same trusts, etc., to which they would have been subject had they descended. This enactment was

intended to obviate the severe rule of the common law by which such lands when escheated were held to belong to the king free from the trust. (Revisors Notes, 5 N. Y., Statutes at Large [Edm. Ed.], 297.)

With reference to the personal estate of persons dying intestate without next of kin, it appears to have been the uniform practice of the State since its organization to take such property, and hold it either for the benefit of the community at large or some division of the State, or to be returned to such persons as may from considerations of natural justice and equity seem to the legislature to be entitled thereto.

We think, therefore, that the property left by Mrs. Spicer reverted to the State upon her death, and that it was competent for the legislature to grant the rights thereby acquired, and the right to administer thereon to such person or persons as in their discretion they judged equitably entitled thereto. (*Englishbe* v. *Helmuth*, 3 N. Y. 294.)

The only remaining question relates to the validity of the act by which the legislature assumed to dispose of the property in favor of the appellants.

It is claimed by the respondents that it is void for the reason that it violates the requirements of section 16 of article 3 of the Constitution providing that " no private or local bill which may be passed by the legislature, shall embrace more than one subject and that shall be expressed in the title." It is argued that the act embraces more than one subject, and that no subject whatever is properly or correctly described in its title. The title reads as follows : "An act to release the interest of the people of the State of New York in certain real estate to Henry Spicer, Catharine Valentine, Georgiana Farrington, Sarah F. Chapman and Charles Spicer, and for other purposes." The act is clearly both private and local since it relates to a specified piece of real estate described as lying and being in the city of New York ; and it purports to convey such land to five persons for their individual use and benefit. (*Matter of N. Y. Elevated R. R. Co.*, 70 N. Y. 327, 350.) By separate provisions it first purports to release the interest which the State acquired by

escheat in certain real estate described ; and secondly, it assumes
to release all the interest which the State had to the personal
property and effects of which Ellen Spicer died possessed of or
was entitled to. As the act reads there is no apparent connec-
tion between the real property described in the first section
and the personal property referred to in the second section, and
from all of the information furnished by the act, we are led to
conclude that the Legislature intended to deal separately, not
only with real and personal property but also property derived
from different sources. It is quite obvious that the title does
not describe the interest intended to be conveyed by the latter
section, for it is not only not referred to therein, but it is
excluded by implication, through the reference to an interest
in real estate alone ; and it is equally clear that the first section
describes no interest possessed by the State, for we have seen
that it had an equitable right of action only. That the act
embraced in fact more than one subject, can hardly be denied
inasmuch as the title itself specifies that it relates to a transfer
of real estate and " for other purposes."

Even if we were able to overcome this objection, we are
of the opinion that the lack of any intelligible reference in
the title to the real object of the act, and its palpable misde-
scription thereof, is fatal to its validity. The true object of the
enactment was, obviously, to convey to some one of the heirs
of George Spicer the rights of property acquired by the State
through escheat or forfeiture in the real and personal prop-
erty of Ellen Spicer. No reference is made in the title to
the former ownership of either George or Ellen Spicer, or to
the fact that the State acquired its interest by escheat or
reversion ; no indication that the act was intended to transfer
any interest in personal property, and no reference to the
place or location of the property affected. There is abso-
lutely no clue in the title by which the attention of any
interested party would naturally be attracted to, or informed
of the real object of the act. The manifest intention of the
constitutional provision was to require sufficient notice of
the subject of proposed legislation of a private or local char-

acter, to be so expressed in the title, as to put not only interested parties, but, also, all persons concerned in the proposed legislation, upon their guard, and to inform all persons reading it, of the general purpose and scope of the act. While this is not required to be done by pursuing any particular formula, or with much detail of specification, and great liberality of construction should be indulged in by the courts to uphold the constitutionality of legislation, yet a due regard to constitutional requirements demands that when its plain and obvious purposes are disregarded or evaded, the judgment of the court should give effect to its provisions. (*Purdy* v. *People*, 4 Hill, 384, 418; *People* v. *Hills*, 35 N. Y. 452.)

It was said by Judge DAVIS, in the case last cited: "It is not a sufficient compliance with this provision that a subject is expressed in the title of the act, the true and actual subject or object must be there expressed, or the evil and mischief which the framers of the Constitution sought to avert and prevent will not have been effectually guarded against." Judge GARDINER says that "the purpose of the sixteenth section was that neither the members of the legislature nor the public should be misled by the title." (See *Mutual Ins. Co.* v. *City of New York*, 8 N. Y. 241, 253.)

An examination of the statutes relating to escheated estates for several years past, shows that from twenty to thirty are usually passed in each year, and that the titles of such acts, though varying widely in the phraseology employed, usually contain a reference to the locality of the property affected, or the name of the person through whose decease it is claimed to have been forfeited, or some other circumstance affording information as to the scope and purpose of the act. While many of them are clearer and more concise than others, yet in every one of the twenty-two passed at the session of 1885, except chapter 377, we find some reference to the circumstances calculated to direct the attention of interested parties to the object of the proposed legislation.

There would seem to be no excuse, in the desire to secure brevity and conciseness of statement, for a title which was so

well calculated to elude the vigilance of interested parties as the one under consideration. It seems to us that the title of this act was evasive and misleading, and comes fairly within the letter and meaning of the constitutional inhibition.

As we have heretofore seen the legal title to the property in question was in the heirs-at-law of George Spicer, and at the time of the passage of the act they were, for that reason, presumably in possession of the property and the legal owners thereof. This title and possession they had a right to maintain against all persons except Ellen Spicer, or those who had lawfully succeeded to her rights; and had such a standing in court as authorized them to raise the objection that the act did not vest the rights of Ellen Spicer, in the grantees from the State.

The conclusion reached by us is, that the State not having parted with its interest in the property in question by chapter 377, Laws of 1885, is equitably entitled to the surplus moneys arising on the foreclosure sale; and that, consequently, neither of the persons filing claims thereto has shown any superior right over that of other claimants, and is not entitled to an order giving him, or them, exclusive rights therein. Under the circumstances of this case, we are of the opinion that there should be a rehearing of the matter before the Special Term, of which the attorney general, in view of our opinion as to the constitutionality of chapter 377, should have notice and be afforded an opportunity to be heard.

This conclusion renders it necessary to affirm the order of the General Term, so far as it reverses the order of the Special Term directing distribution to the grantees of the State; and to a reversal of that part of its order directing a distribution of the surplus among all of the heirs of George Spicer. An order to this effect should be entered, without costs to either party, and the case should be remanded to the court below for further consideration.

All concur.

Ordered accordingly.