[Civ. No. 5376.   Fourth Dist.   Apr. 3, 1957.]

TRUEMAN W. STANSBURY, Plaintiff and Appellant, v. RAE HELENE STANSBURY, Respondent; THOMAS W. STANSBURY, Defendant and Appellant.

33

333

33

Kendall & Howell and Robert E. Krause for Appellants.

Oscar F. Catalano and Frederick E. Hoar for Respondent.

MUSSELL, J.—Plaintiff, Trueman W. Stansbury, hereinafter referred to as "Trueman," and defendant, Rae Helene Stansbury, hereinafter referred to as "Rae," were married in New York on February 25, 1945, and at the time of this marriage, plaintiff's previous marriage with one Jennie H. Stansbury was not dissolved and was in full force and effect. He had secured an interlocutory decree of divorce from her on July 28, 1944, and the final decree terminating this marriage was not entered until August 9, 1945.

Plaintiff and defendant came to California and lived together as man and wife until plaintiff filed his complaint

herein for annulment of his marriage to Rae, on June 9, 1955. On November 5, 1952, Rae filed an action for divorce against Trueman in Kern County, alleging cruelty and asking for a division of the community property. On November 12, 1952, the parties entered into a property settlement agreement, dividing the community property and agreeing that all property thereafter acquired by either party should be the property of the party acquiring it. On January 21, 1954, the parties entered into a written stipulation which, among other things, stated that the parties had effected a complete reconciliation and it was their desire that the court set aside the interlocutory decree which had been entered on December 10, 1952. In accordance with this stipulation, the court set the interlocutory decree aside by order dated January 25, 1954.

On May 12, 1955, Trueman filed an action for divorce against Rae in Los Angles County, alleging cruelty and that there was no community property, the parties having entered into a property settlement agreement on November 12, 1952, whereby they divided and converted into separate property such community property as was theretofore owned and possessed by them. This action was transferred to Kern County on a motion for change of venue and was then voluntarily dismissed. Thereafter Trueman filed the complaint herein for annulment on June 9, 1955. In this complaint Trueman alleged that there was no community property, the parties having, on November 12, 1952, entered into a property settlement agreement dividing said property. Rae filed an answer to this complaint and also filed a cross-complaint and an amended cross-complaint for divorce in which Thomas W. Stansbury, defendant's father, was also named as a defendant and in which Rae alleged the existence of community property consisting of a 1 per cent overriding royalty in all oil, gas and other hydrocarbons produced from certain lands therein described, a house and lot in Bakersfield, a 1955 Chevrolet car and certain household furniture.

The trial court rendered judgment annulling the marriage and decreed that the community property be divided equally between the parties, awarding one-half of the 1 per cent overriding royalty in all oil and gas and other hydrocarbons produced from the property described therein to each of the parties; awarding one-half of such royalties in the possession of defendant's father, Thomas W. Stansbury, to each of the parties; awarding the household furniture to Rae, the Chevrolet to Trueman, and the residence of the parties to the parties

as cotenants in equal shares. Trueman and Thomas Stans-
bury appeal from the judgment, claiming that the evidence is
insufficient to support the findings and judgment. Their prin-
cipal contention is that the court erred in the division and
award of the property of the parties, particularly the 1 per
cent overriding royalty.

On September 23, 1952, Milton Stansbury and James H.
Davis, doing business as Crown Drilling Company, entered
into a lease covering the property involving the 1 per cent
royalty herein and oil came in on this property on December
25, 1952. Prior to that time Trueman had been engaged in
the business of "getting leases" and had done some work
for the Crown Drilling Company for which they had orally
promised him a 1 per cent interest. Trueman testified in this
connection that he did not receive any document that formally
gave him an interest in this lease until April, 1953; that on
March 16, 1953, the Division of Corporations issued a permit
for the issuance of the 1 per cent interest to him and an
assignment was executed March 26, 1953, by the Crown Drill-
ing Company to him. This assignment provided, among other
things, that the overriding royalty should be paid only by the
party producing oil, gas and other hydrocarbon substances
and only if, as and when such substances were produced and
saved under the lease and sold or removed from the lands.
Oil was commercially produced from this lease in January,
1953, and some time in March of that year Trueman received
the first royalty check in the sum of $190. In 1953 the Crown
Drilling Company sold its interest in this lease to Standard
Oil Company and thereafter the royalty checks were increased
in amounts until they reached the sum of $1,200 per month.

On May 3, 1953, Trueman and Rae assigned the 1 per cent
royalty interest to Thomas Stansbury and he thereafter col-
lected the royalty checks. He withheld $1,000 from them to
take care of an indebtedness owed by Trueman and gave the
balance to Trueman and Rae, sometimes to both of them and
sometimes to one or the other. Thomas testified that he took
the assignment "as a favor" and the record shows that on
September 1, 1954, he and his wife, in writing, reconveyed
and transferred the said royalty interest to Trueman. Appel-
lant Thomas Stansbury has no interest in the royalty other
than in the disposition of money he still holds under the
assignment to him.

Appellant Trueman contends that the royalty interest is
his separate property under the terms of the property settle-

ment agreement of November 12, 1952, particularly under the provision thereof as to after-acquired property.

The interlocutory decree of December 10, 1952, in the action in Kern County between Rae and Trueman Stansbury, contained an order approving the property settlement agreement. However, that decree was set aside pursuant to a stipulation of the parties. This stipulation, which was signed by both parties and acknowledged before a notary, recited that the parties have effected a full and complete reconciliation and were living together as husband and wife. In this connection, the court found that the parties effected a reconciliation and then and there agreed that said property settlement agreement be abrogated, annulled and canceled and that any and all property previously accumulated or thereafter acquired should become the community property of the parties. This finding has substantial evidentiary support and cannot be here disturbed. (*Berniker* v. *Berniker*, 30 Cal.2d 439, 444 [182 P.2d 557].)

In addition to the written stipulation of the parties acknowledging a reconciliation, Rae Stansbury testified that after the divorce in which she obtained the interlocutory decree on December 10, 1952, and on the same day, she went home and the following conversation with Trueman took place:

''He said, 'I can't understand why we can't act like grown people.' He says, 'After all we have taken our vows for keeps.' I said, 'I have always felt that way, Trueman.' And he said, ''Well, I promise you I will be a better husband to you, I will try to be kind and courteous, I will try. We will get along there's no question about it, I know we can get along.' Then he said, he went into the bedroom and on the dresser there was a large envelope, the usual business type envelope with Fleharty's—I don't remember all the individuals in that law office, and in it there was the divorce complaint as well as two copies of the property settlement agreement; so he said, 'We don't have any need for this.' And he picked it up and tore it up handed it to me and said, 'Throw it in the wastepaper basket.' He said, 'We are man and wife and there should be no separate property. We own everything together, whatever is yours is mine and whatever is mine is yours.' And that was about all.''

Richard DeWitt, a next door neighbor, testified that he and his wife moved into his home in August, 1952, at which time the Stansburys were then residing in their residence; that during the Christmas holidays of 1952, Trueman stated to him

that he and Helene had an oil well come in; that they were going to share in this oil well and that in 1955 Trueman referred to a trust he and Helene had from an oil well. Another neighbor, Mrs. Coach, testified that right after Christmas, 1952, Trueman and Helene came over and were very enthusiastic, said the well had come in on Christmas Day they had an interest in and that it was one of the finest Christmas presents he and Helene could have had; that Trueman said that Helene wouldn't have to teach after they had a few wells on the lease.

Trueman testified that while living with his wife in 1952, 1953 and the early part of 1955, the royalty payments were used to pay the expenses of the house, the payments on the home itself, car payments, utility bills, fire insurance, clothing for his wife and taxes.

Rae testified that after Trueman had filed his divorce action in Los Angeles County she was served with the complaint and objected to his allegation therein that there was no community property; that he then stated that it was an error, saying, "I know, we have our car, we have our home, and the 1% overriding royalty."

█ Whether a property settlement agreement does or does not continue in force depends on the mutual intentions and understanding of the parties. (*Morgan* v. *Morgan*, 106 Cal. App.2d 189 [234 P.2d 782]; *Margolis* v. *Margolis*, 115 Cal. App.2d 131 [251 P.2d 396].) █ There is substantial evidence herein of an actual reconciliation of the parties as of December 10, 1952, and their continuous residence and cohabitation together in good faith as man and wife until the final separation in March, 1955. The reconciliation, followed by the resumption of marital relations, operated to cancel the executory provisions of the property settlement agreement and it was an executed oral agreement cancelling the property settlement contract. (*Mundt* v. *Connecticut Gen. Life Ins. Co.*, 35 Cal.App.2d 416, 418, 419 [95 P.2d 966].) The evidence also shows that when the property settlement agreement was executed on November 12, 1952, the 1 per cent royalty was not in existence except as an oral promise contingent on actual production and sale of oil from the premises from wells not yet drilled. The royalty was not mentioned in the agreement and there is no evidence that it was in fact contemplated by the parties.

It is contended by appellants that Rae Stansbury was estopped by her fraudulent purpose in executing an assign-

ment and delivery of the 1 per cent overriding interest to appellant Thomas W. Stansbury. This argument is based on the assumption that Rae joined in the transfer in order to defraud Trueman's creditors. There is a conflict in the evidence in this respect and the trial court's implied finding cannot be disturbed. If we assume that the assignment was fraudulently executed, the 1 per cent royalty interest was reconveyed by Thomas Stansbury to Trueman and he then became revested with the interest conveyed by the assignment.

As is said in *Roesman* v. *DeHart*, 80 Cal.App.2d 737, 740 [182 P.2d 263]:

"It is the general rule that one who conveys property to another in fraud of creditors cannot recover the property from his fraudulent grantee. (12 Cal.Jur. 1026.) It is otherwise however if the fraudulent grantee voluntarily reconveys to the fraudulent grantor. The rule applicable in such cases was quoted by this court from 27 Corpus Juris 658 in *Williamson* v. *Kinney*, 52 Cal.App.2d 98, 103 [125 P.2d 920]:

" 'While a fraudulent grantee is under no legal obligation to reconvey, it is said that he is under a moral obligation to do so, and all subsequent acts done by him in execution of this duty should be favorably considered in equity, the moral obligation being a valuable and sufficient consideration for a reconveyance. If in fulfillment of his moral obligation he makes a reconveyance, such act will be binding on him, and if the rights of no innocent third person have intervened, the fraudulent grantor will become revested both in law and in equity with the title previously conveyed to his grantee; and the grantee will be estopped from thereafter setting up any claim to the property.' "

. The trial court found that at the time of the marriage in New York on February 25, 1945, Rae Stansbury was a single woman and had not been previously married; that Trueman Stansbury represented to her that he had been previously married but that said marriage had been dissolved and terminated and that he was a divorced man and legally competent to contract a valid marriage with Rae Stansbury; that she, in good faith, believed said representations and was without any knowledge that the previous marriage of Trueman and Jennie Stansbury was in full force and effect and believed that he had procured a valid decree of divorce from her, and so believing entered into said ceremonial marriage with Trueman Stansbury and thereafter lived with him, as his wife, in a putative state of marriage in the bona fide belief that a

valid marriage at all such times existed between her and Trueman Stansbury until the invalidity of such marriage was tendered by him in his complaint for annulment. These findings are supported by substantial evidence and appellants do not attack the sufficiency of the evidence to sustain them, although they claim that the matter was bitterly disputed.

■ The rule in reference to the division of property accumulated during the cohabitation of a man and woman under a putative marriage relationship is stated in *Vallera* v. *Vallera,* 21 Cal.2d 681, 683, 684 [134 P.2d 761], and it is there stated:

"It is well settled that a woman who lives with a man as his wife in the belief that a valid marriage exists, is entitled upon termination of their relationship to share in the property acquired by them during its existence. (*Feig* v. *Bank of Italy etc. Assn.,* 218 Cal. 54 [21 P.2d 421] ; *Figoni* v. *Figoni,* 211 Cal. 354 [295 P. 339] ; *Schneider* v. *Schneider,* 183 Cal. 335 [191 P. 533, 11 A.L.R. 1386] ; *Coats* v. *Coats,* 160 Cal. 671 [118 P. 441, 36 L.R.A.N.S. 844] ; see 11 A.L.R. 1394.) The proportionate contribution of each party to the property is immaterial in this state (*Coats* v. *Coats, supra*; *Macchi* v. *LaRocca,* 54 Cal.App. 98 [201 P. 143]), for the property is divided as community property would be upon the dissolution of a valid marriage. (*Sanguinetti* v. *Sanguinetti,* 9 Cal.2d 95 [69 P.2d 845, 111 A.L.R. 342] ; *Feig* v. *Bank of America etc. Assn.,* 5 Cal.2d 266 [54 P.2d 3] ; *Schneider* v. *Schneider, supra*; *Coats* v. *Coats, supra, Macchi* v. *LaRocca, supra.*)"

It is apparent that the trial court awarded the property of the parties herein in accordance with the rule announced in the Vallera case.

■ It is claimed by appellants that the award of the Chevrolet automobile to Trueman and the household furniture and furnishings to Rae was unfair. They claim that the court will take judicial notice that the automobile does not exceed $3,000 in value and that since the furniture was insured for $10,000 it was therefore worth that amount. We are not in accord with this contention. There was evidence that the furniture cost $2,500 and at the time of the trial was approximately 9 years old. We find no abuse of discretion in the division of the property made by the trial court.

The judgment is affirmed.

Barnard, P. J., and Griffin, J., concurred.