[Civ. No. 24253.    Second Dist., Div. One.    May 2, 1960.]

Estate of G. N. ZLAKET, Deceased.    EDNA ZLAKET, Appellant, v. JOSEPHINE MOSHAY, as Executrix, etc., Respondent.

Bartman & Braun, Ernest A. Braun and Paul Gutman for Appellant.

Maury, Larsen & Hunt and George R. Maury for Respondent.

FOURT, J.—This is an appeal from an order denying the petitioner (appellant) a family allowance from the estate of her deceased husband.

A résumé of the facts is as follows:

Appellant and G. N. Zlaket (hereinafter referred to as Zlaket), now deceased, were married November 6, 1920. Zlaket had been previously married and had two daughters as the issue of such marriage. There were no children as the issue of the marriage of Zlaket and petitioner.

On or about April 24, 1939, petitioner and Zlaket made and entered into an agreement entitled "Property Settlement Agreement" which among other things provided as follows:

"PROPERTY SETTLEMENT AGREEMENT

"THIS AGREEMENT made and entered into this 24 day of April, 1939, by and between G. N. ZLAKET, hereinafter referred to as First Party, and EDNA ZLAKET, hereinafter referred to as Second Party,

"WITNESSETH:

"WHEREAS, the parties hereto now are and for more than eighteen years last past have been husband and wife, and

"WHEREAS, certain unhappy differences have arisen between said parties to the extent that they mutually agree to adjust and settle their property rights, and

"WHEREAS, there is a dispute as to the ownership of certain real and personal property more particularly described and which said properties they desire to divide in the manner hereinafter set forth, and

". . . . . . . . . . . .

". . . it is hereby agreed by and between the respective parties hereto as follows, to-wit:

". . . . . . . . . . . .

"VIII

"It is mutually agreed by and between the parties hereto in consideration of this agreement and the transfer of the properties as hereinbefore set out, that any and all property hereafter acquired by either of them, whether it be acquired by his or her own labor and effort, or by gift, devise, bequest,

or otherwise, shall be the sole and separate property of the party so acquiring, or who receives the same, and the other party shall have no interest or claim whatsoever therein.

"IX

"It is further mutually understood and agreed that each of the parties hereto hereby waive and relinquish all right whatever as the heir of the other pursuant to the Statute of Succession or Inheritance of the State of California, or of any other jurisdiction in which he or she may reside or leave property at the time of her or his demise.

"X

"It is also understood and agreed by and between the parties hereto that they are cognizant of their respective holdings and that this agreement has been explained fully to each of them, and that they hereby express themselves as fully understanding the same, and all of the provisions of this agreement, and that with such full understanding they, and each of them, individually and voluntarily do hereby execute the same.

". . . . . . . . . . . . .

"XII

"It is also understood and agreed that if either party hereto shall maintain any action for divorce or separate maintenance, that neither party to the action shall require the other party to pay any costs, alimony, or attorney fees in such suit or action, as this property settlement is deemed to be a complete and entire adjustment of all of the property rights of the respective parties hereto.

"XIII

"Each of the parties hereto do hereby waive, renounce and relinquish in favor of the other each and every right and interest in and to the property of the other which he or she may acquire, maintain or assert, including the right of each party to administer upon the estate of the other in the event of the other dying intestate, such renunciation, surrender and release to inure to the benefit of the heirs, legatees and devisees of the other party, and to the sole exclusion of the party hereby making such renunciation.

"XIV

"It is hereby further covenanted and agreed that first party will protect and save harmless the second party from any and all litigation arising out of the purchase or transfer of any

property contained in this agreement, and likewise second party will protect and save harmless the first party from any and all litigation arising out of the purchase or transfer of any property contained in this agreement, it being further understood and agreed by each of the parties hereto that this agreement constitutes a final and complete determination, adjustment and settlement of the property rights and obligations of said parties, each to the other, and that neither party hereto shall ever assert or prosecute in any manner any claim against the other party hereto, except such claim as may be based upon the obligations embraced in this contract.''

The parties shortly after the execution of the agreement separated. Zlaket lived separate and apart from the petitioner for a period of six or seven months. According to the petitioner, Zlaket begged to return and they started to live together once more and continued to so live together until about October 1, 1957, when Zlaket left the petitioner and started a divorce action which was never concluded and the record of which is not before us. Zlaket made out a will in October, 1956. He died on April 29, 1958. On November 12, 1958, petitioner filed her petition for a family allowance and after a hearing held on February 3, 1959, the petition was denied. The trial judge made full findings of fact, based upon substantial evidence and conclusions of law.

The findings were in effect that the decedent died April 29, 1958, and that his estate was pending in the Superior Court in Los Angeles County, that petitioner married Zlaket on November 6, 1920, and that she was the surviving wife, that Zlaket left petitioner about October 1, 1957, and started an action in divorce, that the estate of Zlaket, among other things, included certain named properties, that petitioner had certain named properties, that her income did not equal her living expenses, that the petitioner had made a certain deed in favor of Zlaket and entered into the contract heretofore set forth in part and that each party to the agreement had, until the death of Zlaket, kept and maintained all of his or her property as separate property and that the agreement had not been abrogated or cancelled. The court then concluded therefrom that the petitioner was not entitled to a family allowance from the estate of Zlaket.

The petitioner testified at the hearing in effect that when Zlaket left her in 1939 and after he had been gone about six or seven months that ''he came back and begged me to take him back.'' She further testified that they started living to-

gether and that within about two or three weeks thereafter "I came across this agreement that we made" and:

". . . I says to him—we were sitting together at the dining room table, you know, writing a letter, and I said: 'Oh, look at that agreement. I still have it. Where is yours? Let's tear them up together.'

"And he said: 'I tore mine a long time ago.'

"And I said: 'All right.' And I took my agreement and tore it up, and I was under the impression all these years, from 1939, that the agreement ——

". . . . . . . . . . .

"THE WITNESS: That is the conversation. He said: 'I tore mine a long time ago'; and, naturally, I took mine right in front of us and I tore mine, and I said: 'Why, that's fine, and thank God it's over,' and we both were very happy."

In answer to a question as to whether the parties had exchanged any of their property at or about the time of the conversation, the petitioner answered that the decedent had said to "leave them alone" and:

" '. . . Leave them alone, but we will sell those two pieces of property and we will start a new business'; and that is why I sold my two pieces of property, and we started a business in San Fernando." The business which was later purchased was sold and petitioner received certain property or money therefor.

The appellant contends that (1) it was error for the trial court to receive the agreement into evidence; (2) that it was error to find that the petitioner and the decedent each kept and maintained all of his or her property as separate property until the date of decedent's death and that said agreement had not been abrogated or cancelled; (3) that it was error to make the conclusions of law it did make; and (4) it was error to make the order.

Section 680 of the Probate Code reads as follows: "The widow, widower, minor children and adult children who have been declared incompetent by order of court are entitled to such reasonable allowance out of the estate as shall be necessary for their maintenance according to their circumstances, during the progress of the settlement of the estate, which, in case of an insolvent estate, must not continue longer than one year after granting letters. Such allowance must be paid in preference to all other charges, except funeral charges, expenses of the last illness and expenses of administration, and

may, in the discretion of the court or judge granting it, take effect from the death of the decedent.''

■ The execution of the agreement was set forth in the objections of the executrix to the petition. In our opinion it would have been error under the circumstances to have excluded the agreement. (See *Estate of Schwartz,* 79 Cal.App. 2d 301, 306 [179 P.2d 863].) The appellant cites no authority for her position or contention in this instance.

■ As to appellant's asserting that the trial court should have, upon the evidence in this case, found in her favor there is no merit. Each of the parties, petitioner and Zlaket kept their respective properties separate and apart from each other. Petitioner's property after the agreement was never in Zlaket's name or in a joint name. Petitioner never returned any of the property which she received under the agreement. She maintained her own bank account. There was substantial evidence upon which the trial court based its finding on the question involved and in that there was such substantial evidence we are without power to substitute our judgment for that of the trial court's, even if we were so inclined.

The trial judge analyzed the agreement and found in effect that it provides what shall be done with the properties, present and future of petitioner and Zlaket. Death was definitely contemplated at the time of the agreement and each party waived the right as the heir of the other to succeed to or inherit property from the other; in effect each was to support and maintain himself or herself; each waived the right to the property which he or she might acquire, including the right to administer upon the estate of the other in the event of intestacy. It is clear that there was definitely the intention of the parties to defeat the laws of inheritance and to waive any beneficial provisions thereof.

The trial court observed and heard the witnesses and considered the evidence and the facts of the case. ■ The judge apparently did not believe the petitioner in her testimony and such was his privilege. ■ It was appropriately said in *Herbert* v. *Lankershim,* 9 Cal.2d 409, 472 [71 P.2d 220] as follows:

'' 'While the jurors are the sole judges of the facts, the question as to whether or not there is substantial evidence in support of the plaintiff's case is always a question of law for the court (*Grant* v. *Chicago etc. Ry. Co.,* 78 Mont. 97 [252 P. 382], and in determining this question ''the credulity of courts is not to be deemed commensurate with the facility and

vehemence with which a witness swears. 'It is a wild conceit that any court of justice is bound by mere swearing. It is swearing creditably that is to conclude the judgment.' " '

"The rule in cases such as the one before us is that the court must view the transaction with the 'most scrutinizing jealousy.' This means, of course, any court in which the issue may be raised. Oral evidence, of which there is no satisfactory independent corroboration, is the weakest kind of evidence known to the law. In *Smellie* v. *Southern Pac. Co.,* 212 Cal. 540 [299 P. 529], this court, in considering the same kind of evidence upon which plaintiff must rely in the instant case, said:

" ' "Evidence of the declarations or oral admissions of a party are always received with caution. (Code Civ. Proc., sec. 2061, subd. 4.) . . .

██ " ' " 'A third inherent weakness to be found in the testimony of Ireland is that it purports to give the statements or declarations of a deceased person. Regarding testimony of this character, this court said: 'The evidence is of oral admissions against interest by a man whose lips are sealed in death. What, then, does the law say of such evidence (assuming now its admissibility)? The Code of Civil Procedure declares (§ 2061, subd. 4) that "the evidence of oral admissions of a party ought to be received with caution by a jury." In *Mattingly* v. *Pennie,* 105 Cal. 514 [45 Am.St.Rep. 87, 39 P. 200], this court in bank said: "No weaker kind of testimony could be produced." Again in bank (*Austin* v. *Wilcoxson,* 149 Cal. 24 [84 P. 417], this court has said: "It is not stating it too strongly to say that evidence so given under such circumstances must appear to any court to be in its nature the weakest and most unsatisfactory." ' (*Estate of Emerson,* 175 Cal. 724, 727 [167 P. 149, 151].) We might go on and cite many other authorities, but the above are sufficient for our present purpose." ' "

██ In *Estate of Yoell,* 164 Cal. 540 [129 P. 999] the terms used in the agreement in that case are not the identical terms and phrases used in the agreement in the case before us. The terms are substantially similar however and the court in deciding that case said at pages 550-552, among other things, the following:

"Upon the death of the husband the surviving wife may receive a family allowance when and only when she is a member of the family *and receiving or entitled to receive support as such member, and when, even though a member of the fam-*

*ily, she has not parted with or relinquished her right to make demand for such allowance.* ■ (a) To establish such relinquishment of right, no more apt words could be chosen than those deliberately employed in the agreement under consideration. True, it does not in terms and by name relinquish the right to a family allowance, but it does more than this. The wife covenants that she has renounced and waived all claim which she has or may have as *heir* of the husband or as his *surviving wife.* It is only as heir and surviving wife that she could make her demand for a family allowance, a demand which she has solemnly renounced. . . . Elsewhere, language not so strong as that contained in this agreement has been held to bar the widow under similar applications. Thus in *Kroell* v. *Kroell,* 219 Ill. 105, [4 Ann. Cas. 801, 76 N.E. 63], by terms of an ante-nuptial contract, each party released, conveyed, and quitclaimed to the other, 'all interest in the property of the other, both real and personal, renouncing forever all claims, in law and equity, of curtesy, dower, homestead and survivorship.' It was contended by counsel for the widow that these terms of the contract did not embrace the widow's award, to which she was therefore entitled on application. But the court said : 'The right to a widow's award, under the statute, depends upon marriage, the continuance of the marriage relation until death, and the survivorship of the wife. The contract included all rights acquired by either one of the parties to it who should outlive the other, in the property or estate of the other, and clearly embraced the widow's award.' In *Appeal of Staub,* 66 Conn. 127 [33 A. 615], where the wife in an ante-nuptial agreement received a certain sum 'in lieu of dower and all other rights and interests and claims which she would but for the agreement have had in the estate covenanted to receive this money ''in lieu and as full payment for her dower right and of all other claims and interest she otherwise would have had in his estate,'' ' this language was held to bar her right to the statutory allowance during the settlement of the estate. To the same effect are *Appeal of Cowles,* 74 Conn. 24 [49 A. 195] ; *Paine* v. *Hollister,* 139 Mass. 144 [29 N.E. 541] ; *Tiernan* v. *Binns,* 92 Pa.St. 248; *Buffington* v. *Buffington,* 151 Ind. 200 [51 N.E. 328] ; *Young* v. *Hicks,* 92 N.Y. 234; *Johnston* v. *Spicer,* 107 N.Y. 191 [13 N.E. 753] ; *Pavlicek* v. *Roessler,* 222 Ill. 83 [78 N.E. 11] ; *Brown* v. *Brown's Admr.,* (Ky.), 80 S.W. 470; *In re Deller,* 141 Wis. 255 [25 L.R.A. N.S. 751, 124 N.W. 278].''

In a more recent case, *Estate of Brooks,* 28 Cal.2d 748 [171

P.2d 724], it was stated in effect that to qualify for a family allowance the widow must be entitled to support from her husband at the time of his death. The court said at page 755:

". . . that a family allowance was intended by the Legislature to continue, during the settlement of the estate, the support that the wife was previously receiving, or was at least entitled to receive. (See *Estate of Byrne, supra,* Myr. Prob. Rep. 1; *In re Noah, supra,* 73 Cal. 583 [15 P. 287, 2 Am.St. Rep. 829]; *Estate of Miller, supra,* 158 Cal. 420 [111 P. 255]; *Estate of Yoell, supra,* 164 Cal. 540 [129 P. 999]; *Estate of Fulton, supra,* 15 Cal.App.2d 202 [59 P.2d 508]; *Estate of Ruiz, supra,* 53 Cal.App.2d 363 [127 P.2d 945]; *Estate of Egeline, supra,* 53 Cal.App.2d 368 [127 P.2d 948].) The cases that do not insist upon the condition that the wife be entitled to support seem to lose sight of the purposes for which an allowance is granted. They give her an allowance intended to continue a support that she neither received previously nor was entitled to receive. No doubt the Legislature intended also to protect the family by restricting the decedent's absolute testamentary freedom and by continuing to the family as against creditors the exemptions to which the decedent was entitled during his life. (*See* 1 Woerner, Administration (3d ed.) § 77; Atkinson, Wills, 101.)"

Section 155 of the Civil Code provides in part:

"Mutual obligations of husband and wife: Husband and wife contract towards each other obligations of . . . support." As heretofore set forth the agreement in this case provides in part: ". . . it being further understood and agreed by each of the parties hereto that *this agreement constitutes a final and complete determination, adjustment and settlement of the . . . obligations of said parties, each to the other.*" (Emphasis added.)

■ True it is that the agreement did not specifically use the word "support," the agreement did deal with the "obligations" of each to the other and therefore "support" was within the scope of the agreement. We entertain no doubt that the petitioner waived any rights which she might have otherwise had.

■ The fact that petitioner and decedent resumed some sort of marital relationship after the agreement was signed does not in and of itself necessarily cancel the executory provisions of the agreement. It depends upon the mutual intentions and understandings of the parties. (*Stansbury* v. *Stansbury,* 149 Cal.App.2d 760 [309 P.2d 137].) And in our

case the trial court, upon substantial evidence found in effect that there was no rescinding of the agreement and to the contrary, namely that the agreement was in full force and effect and that each person abided by it strictly up to the date of the death of Zlaket.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.