(18 App. Div. 250.)

LAMB v. LAMB et al. (two cases).

(Supreme Court, Appellate Division, Second Department. June 15. 1897.)

1. ANTENUPTIAL CONTRACT—WHAT CONSTITUTES.
    An oral promise by a woman, in a conversation with her intended husband, to make him equal with her in her property, by making a division of that which belonged to her, cannot be enforced as an antenuptial contract.

2. HUSBAND AND WIFE—GIFTS—TRUSTS—EVIDENCE.
    A husband occupies such a relation of trust and confidence to his wife that, where property conveyed to him by his wife is alleged by her to be held in trust for her, but is claimed by him as a gift, he is bound to show by unmistakable evidence that the gift was freely and deliberately made, and that the transaction was fair and proper.

3. SAME—ENFORCEMENT OF TRUST—STATUTE OF FRAUDS.
    Where property has been obtained by a husband from his wife by an abuse of the confidential relation between them, equity may impress upon such property, in the hands of the husband or his grantee, a trust for the benefit of the wife, without regard to the statute of frauds.

4. SAME—SECRET TRUSTS—BONA FIDE MORTGAGEES.
When· a wife has vested title to her property in her husband, though
in consequence of his abuse of her confidence, and intended to be upon a
secret trust for her, a mortgage, taken in good faith to secure a loan made
to the husband, constitutes a valid lien on the property.

5. SAME—EVIDENCE TO ESTABLISH TRUST.
Upon the evidence in this case as to the dealings between husband and
wife in relation to the wife's property, by which the husband had acquired
title to such property without consideration, and had disposed of and incum-
bered the same for his own benefit, *held*, that equity would impress a trust
for the benefit of the wife upon such property in the hands of the hus-
band and those holding title thereto for his use.

Appeal from special term.

Action by Florence Fisher Lamb against William R. Lamb and oth-
ers. There were judgments for plaintiff directing a conveyance of
real estate to her, and for rents, and plaintiff and defendants William
R. Lamb and Benjamin R. Lamb appeal. Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT,
HATCH, and BRADLEY, JJ.

Edwin C. Low, for appellants.
Edward A. Hibbard, for respondent Lamb.
Edward E. Sprague, for respondent Hamilton Trust Co.

GOODRICH, P. J. The plaintiff and the defendant Dr. William
R. Lamb were married in October, 1893, at Providence, R. I. In No-
vember, 1895, they separated, and at the time of the commencement
of this action, in February, 1896, they were living apart from each
other. The plaintiff and her brother, Elwell T. Fisher, inherited
from their father, who died in 1891, 34 vacant lots at Flatbush, which
were valued at about $18,000, and which were subject to the dower
right of their mother, Mary A. F. Lamb. The plaintiff purchased
her brother's interest in the lots, and also the dower right of her
mother, for which latter she gave her own note of $2,000. She thus
became sole owner of the premises. Shortly after her marriage, and
in December, 1893, she executed a deed of the 34 lots to her counsel,
Albert A. Baker, of Providence, to be by him conveyed to the hus-
band, Dr. Lamb. The plaintiff claims that these conveyances were
intended to put the title in the name of Dr. Lamb· as her agent, and
for her benefit, for the sole purpose of enabling him, when he effected
sales or trades of the property, or parts thereof, to execute deeds to
intending purchasers without the necessity ʼof waiting to· obtain her
signature thereto, while the husband claims that they were executed
in pursuance of a verbal antenuptial agreement to do so. A ques-
tion of fact between the parties is thus sharply and distinctly pre-
sented, and their testimony is diametrically opposed. This renders·
necessary a careful analysis of the evidence. Mrs. Lamb testified
that no consideration whatever was paid by Baker or her husband for
the deeds, and this is not disputed, except that Dr. Lamb testifies,
and the plaintiff concedes, that he assumed and agreed to pay the·
$2,000 represented by the note which she had given to her mother
for her dower right, and that he gave the mother a note for that
amount, which was to be paid out of the proceeds of sales, and upon

which, as the evidence shows, he subsequently paid $200, but no more; that a judgment had been recovered in the interest of the mother, though in the name of another person, and that an execution upon the judgment has been returned unsatisfied; and that a receiver in supplementary proceedings has been appointed. The plaintiff further testified that shortly after her marriage her husband told her that her property was going to rack and ruin for want of managing and attention, and continued to talk in the same strain, night after night, saying that women understood nothing about business, and did not know how to manage affairs, and that, if the title to the Flatbush lots were transferred to him, he would come on to New York, and manage the property, and make money for her by selling for cash or exchanging for other property; that even when she was ill he continued his persuasions, owing to all of which she consented to execute a transfer of the property; that he also informed her that he had opportunities to make desirable exchanges of some of the lots for improved property, and that it was necessary to have the title stand in his name, so that he could quickly make transfers without troubling her, or waiting to send to Providence for her signature; and that it was for this reason only, and on account of her confidence in him, that she made the transfer. The husband, on the other hand, testified that before the marriage, and after a courtship of over a year's duration, he had a conversation with the plaintiff, which I quote in his own words, as it is upon this conversation that he bases his claim to an antenuptial agreement:

"Q. You have been asked in reference to an antenuptial agreement. What do you mean by that? A. I mean that we had an agreement and understanding before we were married concerning property. We had a conversation on that subject. It was in reference to getting married. I stated at that time that I wasn't prepared to get married just now, because I hadn't the means. I told her that I hadn't the means at the present time, and I didn't care to assume the responsibility that generally incurs. That was, perhaps, several weeks before we were married. We had had an understanding, though. prior to that. Our understanding was expressed in words. She said that that needn't make any difference; that she would make me equal with her in everything,—property and everything else we would be equal. She would give me enough of her property so that we should be equal. I don't know that those lots were spoken of at that time specially. I don't know that there was anything else. That was the substance of the conversation. It was several weeks after that conversation took place before our marriage. I can't say exactly how long. Q. Did you have any other conversation on that subject prior to your marriage? A. Yes. I think we spoke of it again in reference to it. Q. State all that was said on that subject. A. Well. it was understood between us.—we had an understanding,—we had several talks, I think, on another occasion that I should be equal; and it was understood between us that we should have a division of things,— property and so forth. I can identify the writing of the letter shown me."

He further testified that several weeks after the marriage took place he asked her what she was going to do about the matter, and spoke of the Flatbush lots; that she told him that her mother and brother had some interest in them; that her brother would take about $4,000 for his interest, and her mother $2,000 for her interest, and he could have the lots; that she afterwards refused to execute a deed unless he would assume the payment of the mother's note, which he agreed to do, whereupon she directed Mr. Baker to make out

the deeds; that they went to Baker's office, where a note of $8,000 was presented for his signature, apparently to pay for Elwell's interest; that he refused to sign the note, and tore it up, but that some three weeks after the execution of the deed he gave her a note for $1,875,—the sum which she had paid for her brother's interest,—writing in the words payable "after two years, at my convenience." This note is dated July 22, 1894, while the deeds to Baker and the husband are dated December 21, 1893. No sooner had the doctor obtained a title to the 34 lots, than he began operations to dispose of them. He seems to have forgotten that according to his version of the conversation between his wife and himself it was her intention simply to put him upon a pecuniary equality with herself, and that to effectuate that design he should have retained, rather than disposed of, the lots. In March, 1894, he traded off a portion of the lots for an apartment house on Herkimer street, which was subject to a large mortgage. The title to this house, however, was taken in the name of his father, the defendant Benjamin R. Lamb, who gave him back a second mortgage of $10,000, covering the equity in the property. He testified that his reason for taking the title in his father's name was his fear that his wife might refuse to execute the deed when he should want to sell the house, or that she might make some other trouble about it. No consideration was paid by the father for the conveyance. It would seem, also, to have been the doctor's intention to secure himself against any trouble with his father when he took the mortgage back to himself, thus keeping the key to the situation. He also sold three of the lots for $1,500, which he appropriated to his own use. This summary covers the premises described in the complaint and judgment in the first action. The other 11 lots are those to which the second action relates. These lots were included in the deed already set out, but the doctor had another deed prepared, which covered these 11 lots, and he and his wife executed and acknowledged it in August, 1894. It did not contain the name of any grantee, the space therefor being left blank. The doctor told his wife that the name of the grantee was to be filled in when a sale or exchange should be effected. Subsequently the name of Benjamin R. Lamb was written into this space, and this deed was put on record December 11, 1894. The plaintiff received no consideration for this deed. In January, 1895, a mortgage to the Hamilton Trust Company for $2,500 was executed by Benjamin and his wife, and in October, 1895, this mortgage was canceled, and a new mortgage of $3,000 to the same company was executed. In November, 1894, the plaintiff's suspicions seem to have been awakened to such an extent that she consulted counsel, who examined the records, and found the conveyances to William R. Lamb recorded, and this was the first intimation she had that her husband had written the name of his father in the deed which had been executed in blank, or that the Herkimer street house had been conveyed to him. She at once wrote to William R. Lamb, asking him to deed the property back to her, which he refused to do, writing her a letter in which he told her to do her "wifely duty." What were his ideas of that wifely duty does not appear, nor how he expected her to perform it.

The situation thus detailed may be briefly summarized as follows: The plaintiff has no lots, but she has a note of her husband's for $1,875, payable "at his convenience," and which has not been paid, while her note for $2,000 is outstanding. Her husband has received $1,500 for the three lots, $3,000 on the mortgage to the trust company, a mortgage of $10,000 on the Herkimer street house, and his wife's note for $2,000, and the defendant Benjamin has the title to the 11 lots, valued, possibly, at $5,500 (the price at which the doctor sold the other three lots), subject to the mortgage of $3,000. This is at least a peculiar method of "equaling up" property matters between wife and husband. So canny a proceeding as this throws a flood of light backward upon the antenuptial and postnuptial transactions of the doctor with the plaintiff. Surely, there never was a more bald and flimsy attempt to convert an apparently casual conversation between lovers, occurring under the sanction of a marriage engagement, into an antenuptial contract, about which, from time immemorial, the law has placed guards and hedges; a contract which, since the time of the passage of the statute of frauds, in the reign of Charles II., so far as I have been able to find, no one has ever attempted to prove, or been permitted to establish, by parol, or otherwise than by a duly-executed instrument in writing, or by such written evidence as would be sufficient to establish any other contract which is within the statute of frauds. The audacity of such an effort is equal to the unmanliness shown in the disclosure, for purposes of personal gain, of conversation and correspondence which are usually regarded as sacred confidences. It is undoubtedly true that it has been the constant practice of the courts to enforce antenuptial contracts according to their terms (Johnston v. Spicer, 107 N. Y. 185, 194, 13 N. E. 753), but such enforced contracts have invariably been written contracts, the existence of which could not be open to question. It was held in Clark v. Clark, 28 Hun, 509, that the court will scrutinize even such written contracts very closely, and will prevent their being made the instruments of oppression, deception, or fraud. How much more swift will a court of equity be to brand an attempt like that presented for its consideration in the case at bar as an unrighteous attempt to persuade a court of justice to use its high prerogatives to sanction a fraud upon a confiding and deceived wife.

The defendants' counsel urges with great zeal that a trust can only be created by some writing signed by the party who is enabled to declare such trust, citing the statute of 29 Car. II., which has become a part of our common law; but he has evidently overlooked the provisions of the Revised Statutes which, in the title on "Fraudulent Conveyances and Contracts Relative to Lands," provide: "Nothing in this title contained, shall be construed to abridge the powers of courts of equity, to compel the specific performance of agreements in cases of part performance of such agreements." 2 Rev. St. (9th Ed.) p. 1885, § 10. Executory agreements made between a man and woman who afterwards marry were invalid and absolutely void at common law, and irrespective of statute. Pom. Eq. Jur. § 1297. In 1849 an act was passed providing that "all contracts made between persons in contemplation of marriage shall remain in full force after such mar-

riage takes place" (Laws 1849, c. 375, § 3); but this assumes and refers to a contract legally executed, which an antenuptial contract is not, unless it be in writing, and subscribed by the party to be charged thereby. The Revised Statutes (2 Rev. St. p. 135) provide that every agreement, promise, or undertaking made upon consideration of marriage, except mutual promise to marry. shall be void unless such agreement, or some note or memorandum thereof, be in writing, and subscribed by the party to be charged therewith. In Peck v. Vandemark, 99 N. Y. 29, 1 N. E. 41, it was held that such a contract could be established by letters between the parties, and for this purpose, apparently, in the present action, the husband introduced a letter written to him by the plaintiff before her marriage; but, in spite of this publication to the world of his wife's private letter, the attempt failed before the learned court below, and I do not find a line or word in it sufficient even to hint at the existence of any such contract, much less to support and establish it. Nor is it any answer that the plaintiff did not demur to the allegation of the answer that there was an antenuptial contract in pursuance of which the plaintiff conveyed the property to her husband. The answer alleged that, "in pursuance of an antenuptial agreement entered into between the plaintiff herein and the defendant William R. Lamb, and for a good and valuable consideration," the deeds were executed. This allegation was not demurrable, as it did not allege that the agreement was verbal, and so within the statute; and, as the Code does not require a reply to such a defense, it was not necessary to plead the statute. Besides, the action is to impress a trust upon the premises, and this constitutes an appeal to the equitable power of the court. The husband occupies such a relation of trust and confidence to his wife that, in a case like the present, he is bound to show by unmistakable evidence that the gift was freely and deliberately made, and that the transaction was fair and proper. Boyd v. De La Montagnie, 73 N. Y. 498; Haack v. Weicken, 118 N. Y. 67, 23 N. E. 133.

The case at bar seems to us to present a condition of affairs analogous to that considered in Goldsmith v. Goldsmith, 145 N. Y. 313, 39 N. E. 1067, where the court held that when a person, through the influence of a confidential relation, acquires a title to property which he cannot conscientiously retain, the court, to prevent an abuse of confidence, may impress upon the property an implied trust, and so grant relief. The defendants' counsel cites in support of his contention to the contrary the case of Hutchinson v. Hutchinson, 84 Hun, 482, 32 N. Y. Supp. 390, where Mr. Justice Brown said: "The reported cases where it has been attempted to establish a trust by parol evidence are numerous, but the decisions are uniform that the statute cannot be thus set aside," citing authorities; but counsel seems to have overlooked entirely the language of the learned justice when he said:

"The appellant has discussed upon his brief very fully the proposition that neither the allegations of the complaint nor the testimony of the plaintiff was sufficient to establish such a fraud or misrepresentation as would justify a court of equity in setting aside the conveyance. But that element is eliminated from the case by the concession of the respondent's counsel in his first point that 'no fraud is charged against the defendant and appellant in the procuring

of respondent's signature to the deed.'   Neither does the case present those elements usual in constructive or implied frauds.   There was no fiduciary relation between the parties. They did not occupy relations to each other where the defendant naturally exercised any influence over the plaintiff. She owed him no duty whatever."

Instead of this case being an authority to support the defendant's theory, it seems to me exactly in line with the reasoning of this opinion.   It would be a monstrous reproach upon equity if it should prove itself unable to redress a wrong such as the evidence discloses. The case of Wood v. Rabe, 96 N. Y. 414, 422, offers abundant authority for impressing the property in the hands of the defendants with a trust for the benefit of the plaintiff, without regard to the statute of frauds.   Judge Andrews, in a very elaborate opinion, said:

"But there is a large class of so-called constructive trusts, or trusts ex maleficio, where courts of equity treat the holder of the legal title to land as a trustee, and, through the medium of an assumed trust, makes that title subservient to the circumvention of fraud and the attainment of justice.   Trusts of this character are not, I assume, within the exception in the statute.   If they were so considered, then wherever a court of equity, acting upon its own principles, would, independently of the statute of frauds, separate the legal title and the beneficial interest, and fasten a trust upon the property to subserve the purposes of justice, no question under the statute would arise for the obvious reason that the case was by its express terms excepted from its operation, and the statute would never be an obstacle to relief.   But see Davies v. Otty, 35 Beav. 208; Seichrist's Appeal, 66 Pa. St. 237.   So, where a trust is sought to be established from the violation of an oral agreement purporting to create a trust, and a court of equity upholds the trust, and enforces specific performance, the trust is not an implied or constructive trust within the statute.   See Bellasis v. Compton, 2 Vern. 294. The court, in granting relief in case of an oral agreement, proceeds upon the ground of fraud, actual or constructive, and enforces the agreement notwithstanding the statute, by reason of the special circumstances."

And in the case of Bitter v. Jones, 28 Hun, 492, which was a case involving the confidential relation of husband and wife, Mr. Justice Dykman said:

"The statute against the creation of a trust, unless by writing, does not embarrass.   It cannot be invoked to protect these defendants, for that would result in their assistance in the perpetration of a fraud on the plaintiff. That is never permitted. Ryan v. Dox, 34 N. Y. 312. Another reason is that section 10, tit. 1, c. 7, pt. 2, of the Revised Statutes (2 Rev. St. p. 135) is that nothing therein contained shall be construed to abridge the power of the court to compel specific performance of agreements partly executed. The imperious demand ,of justice in this case is for the administration of relief to the plaintiff."

There was other testimony tending to support the statements of the plaintiff and the husband, respectively, but upon the whole evidence the learned justice at the special term, after hearing and seeing the witnesses, decided that the plaintiff's evidence was true, and that the husband's testimony was false.   By this I do not mean even to suggest that any other conclusion can be drawn from the evidence as it stands in the cold print of the record on appeal, or that the appearance and demeanor of the witnesses at the trial were needed to enable the court to arrive at its decision.

The claim set up by the defendants William R. Lamb and Benjamin R. Lamb to hold the property as their own is absolutely without foundation, and they hold the premises impressed with a trust in favor of

the plaintiff. The mortgage to the Hamilton Trust Company, however, is valid as against the plaintiff. She testified that she acknowledged, executed, and delivered a deed of the premises to Baker for the purpose of having him convey the same to, and thus vest the title thereto in, her husband. It is true that she claims that her husband was to hold the title for her benefit, but this, at most, was a secret trust between them, and her husband's abuse of her confidence cannot be permitted to injure or defeat the rights of innocent strangers to the transaction. Crosby v. Association, 6 App. Div. 440, 39 N. Y. Supp. 678. Besides, the legal title, apparently, was already vested in the husband by conveyance to him through Baker, by her execution of the deed in blank as to the grantee, although the blank was afterwards filled in with the name of Benjamin R. Lamb. She executed the deed for the purpose of releasing her dower, not of conveying the fee. That had already passed to her husband by the Baker deeds. The trust company found a valid record title, and was justified in advancing money upon the faith thereof. The plaintiff's own evidence shows that when she executed the deed she knew and spoke of the fact that the name of a grantee was not inserted, and that she authorized her husband to insert one. It makes no difference that she supposed the name of an actual bona fide purchaser, instead of the name of her father-in-law, was to be inserted. Her authorization was not limited by any such special designation. It has been frequently held that parol authority is sufficient to authorize the filling up of a blank, even as to a material part of a sealed instrument. Forster v. Moore, 79 Hun, 472, 29 N. Y. Supp. 1032; Chauncey v. Arnold, 24 N. Y. 330; Kane v. Kane, 13 App. Div. 544, 43 N. Y. Supp. 662.

The judgments are affirmed. All concur.