(29 Misc. Rep. 68.)

## LEARY v. CORVIN et al.

(Supreme Court, Special Term, New York County. September, 1899.)

1. EVIDENCE—COMMUNICATIONS WITH PERSONS SINCE DECEASED.

A husband is competent to testify in a suit by the wife to impress a trust on realty, though he would have a tenancy by the curtesy initiate in the land if the claim is sustained, within Code Civ. Proc. § 829, disqualifying one interested in the result from testifying to communications with a person since deceased.

2. SAME—CONVERSATIONS WITH THIRD PERSONS.

Under Code Civ. Proc. § 829, disqualifying a party from testifying as to communications with one since deceased, the party cannot testify that deceased (her mother) said to a third person, in presence of witness: "This [referring to witness] is my only child. This is the one that I want the property held in trust for by the church."

3. TRUSTS.

A husband and wife and daughter resided together, the mother and daughter doing the household work, and the father serving as a policeman. The daughter had $1,385 in the bank, claimed to have been paid her for services in assisting her mother. The parents told the daughter that, if she would draw her money out of the bank, and give it to them, they would purchase a home, which, at the parents' death, the daughter would have. The money was given to the father, but the purchase was not

made for five years, during which time the father kept the daughter's money. At the time of the purchase the promise first made was repeated, and title was taken in the father's name. Various witnesses testified as to conversations before and after the purchase in which the father promised the daughter to buy a home, which she should have at his death. After the purchase, the daughter and her husband lived with the parents at times, but various separations occurred, owing to the daughter's inebriety and her husband's disagreements with her mother. Her husband paid rent for the apartments kept by them in the property, but no claim was ever made by them to an interest in it. *Held*, that the evidence was insufficient to impress a trust upon the property in favor of the daughter.

Suit by Rose M. Leary against Lizzie J. Corvin and the Church of St. Mary to establish a trust. Complaint dismissed.

J. Philip Berg (E. C. James, of counsel), for plaintiff.

Michael J. Scanlan, for defendant Church of St. Mary.

Turner, McClure & Rolston (David McClure, of counsel), for defendant Lizzie J. Corvin.

WERNER, J. The first questions to be decided arise upon objections to the competency of witnesses and of testimony, upon which, by stipulation of counsel, decision was reserved. The plaintiff's husband, who will have a tenancy by the curtesy initiate in said premises if his wife's claim is sustained, was a competent witness. Bank v. McCarty, 149 N. Y. 71, 43 N. E. 427. As to the competency of the plaintiff to testify to the interview between her mother and Father Hughes, there is some doubt. The cases of Simmons v. Sisson, 26 N. Y. 264; Lobdell v. Lobdell, 36 N. Y. 327; Cary v. White, 59 N. Y. 336; and O'Brien v. Weiler, 140 N. Y. 286, 35 N. E. 587,—seem to hold that a witness who is a party to the controversy, and interested in the event of the action, is competent to testify to conversations between the deceased, under whom the witness claims, and a third person, when it clearly appears that the witness took no part in the conversations. Gambee v. Gambee, 24 App. Div. 448, 48 N. Y. Supp. 501; In re Dunham, 121 N. Y. 577, 24 N. E. 932; Ditmars v. Sackett, 92 Hun, 384, 36 N. Y. Supp. 690; and In re Bernsee's Will, 141 N. Y. 393, 36 N. E. 314,—lay down the rule that such a witness is not competent, under section 829, Code Civ. Proc. The numerous and conflicting decisions of our courts under this section of the Code bear ample testimony to the difficulty encountered in attempting to construe its provisions, and to the impossibility of formulating any rule or rules which shall serve as a universal guide. It is quite plain that the courts, in making decisions under this section, have been compelled to consider the facts of each case, quite as much as the language of the statute. In view of this difficulty, and diversity of decision, it may be well to discuss briefly some of the cases which have decided against the competency of such witnesses.

In Re Dunham, supra, the court held that a nephew of the testator, who was both a specific and residuary legatee under the will, was incompetent to testify to conversations in his presence between the testator and third persons. It was there stated "that the ground for the ruling is that communications in the presence of the witness are deemed to be made to him."

In Ditmars v. Sackett, supra, it was held that:

"It is now quite well settled that the personal transaction or communication between a witness having an interest in the result and a decedent, to which the inhibition applies, includes a transaction or communication of the decedent with another, in the presence of the witness, on the subject to which his interest relates, although the latter takes no actual part in it."

In Re Bernsee's Will, supra, the latest utterance of the court of appeals is in the following language:

"What occurred at that time was a transaction between the testatrix and the witness, within the meaning of section 829 of the Code, although he took no actual part in the conversation, and it was wholly between the testatrix and the attesting witnesses. If active participation in the conversation was necessary to exclude an interested witness, and he should, as an observer, be permitted to testify to transactions in form between the deceased and third persons, although such transactions were in his interest, it would furnish an easy and convenient method in every case of evading the statute. The decisions have enforced the spirit of the statute by excluding such evidence, and have treated transactions between the deceased and third persons in the presence of interested parties as if the witness actually participated therein,"— citing Holcomb v. Holcomb, 95 N. Y. 316, and In re Eysaman's Will, 113 N. Y. 62, 20 N. E. 613.

These cases seem to bear out the statement in Gambee v. Gambee, supra, that the former rule, under said section of the Code, "has been somewhat modified of late years."

The conversation between the plaintiff's mother and Father Hughes consisted of the statement by the mother: "This is my only child. This is the one that I want the property held in trust for by the church." This was precisely as though it had been said to the plaintiff, and, under the rule of the Bernsee Case, was clearly incompetent. The evidence is, therefore, stricken out, and is not considered in the decision upon the merits.

The declarations of Patrick J. Corvin, which are alleged to be against his interest, and which are said to have been made prior to the conveyance to the church, were clearly competent as against him (Loos v. Wilkinson, 110 N. Y. 211, 18 N. E. 99; Bingham v. Hyland [Sup.] 6 N. Y. Supp. 75; Hymes v. Van Cleef [Sup.] 6 N. Y. Supp. 341), and are, therefore, competent against those deriving title through or from him (Baird v. Slaight [Sup.] 8 N. Y. Supp. 603).

The conversations between Mary Corvin, deceased, and Mrs. McCollum and Mrs. Bechdol, respectively, are stricken out by consent, as they should be, for it is quite clear, upon reflection, that neither of them were competent.

There may be some doubt as to the competency of the alleged declarations of Patrick J. Corvin subsequent to the transfer to the church, but, in the view which we take of the merits of the case, this doubt will be resolved against the plaintiff, so as to give her the benefit of an exception. If, however, the evidence contained in these declarations were considered material to the correct decision of the case, we should still be inclined to this ruling, upon the authority of Sanford v. Ellithorp, 95 N. Y. 48, Kain v. Larkin, 131 N. Y. 300, 30 N. E. 105, and Williams v. Williams, 142 N. Y. 156, 36 N. E. 1053.

Having thus considered and disposed of these incidental questions, let us examine the principal question. Was this real estate, at the

time of its transfer to the church, impressed with a trust in favor of the plaintiff? In answering this question we must keep in view the fact that the complaint was framed and the action was tried upon the theory that there were two separate and distinct trusts created for the benefit of the plaintiff. The first is said to have arisen out of the circumstances attending the original purchase of the property. The second is alleged to have been created in the transfer of the property to the church. After striking out the declarations of the Corvins subsequent to the transfer to the church, and the conversation between Mrs. Corvin and Father Hughes in the presence of the plaintiff, there is little, if any, foundation left upon which to rear a trust in that transaction. It must be remembered that we are dealing not with the moral aspect of the domestic relations involved, but with questions of law and equity founded upon facts. If we assume, however, for the purposes of this discussion, that, if all of the evidence which has been ruled out were to be left in the case, it would be impossible to evolve a valid trust out of the transaction with the church, the alleged admissions of the Corvins are utterly at variance with their acts. While professing to have created a trust in favor of their daughter, they had, in fact, made an absolute conveyance of their real estate to the church, subject only to their respective life estates. It may be conceded that the mere form of the transaction is of no consequence, for equity always looks through the forms to the substance of things. But, if there was a trust created in this conveyance to the church, what was its object? It is not suggested that it was to have the church take charge and control of the property for the benefit of the plaintiff. On the contrary, it is claimed that the sole object of this alleged trust was to have the church convey the property to the plaintiff upon the death of the survivor of the Corvins. What was to be gained by such a peculiar proceeding? Nothing, except that the plaintiff was to have title to the property after the death of her parents. It does not require the training of a lawyer, nor intellectual acuteness of a very high order, to perceive that no such red tape was required, if that was the object to be attained. If the title had been left just where it was before the transfer to the church, it would have come to the plaintiff in due time by mere operation of the most simple and fundamental law of inheritance. But it is urged that Mary Corvin was ill; that she thought her husband was weak, and might marry again; that, in order to prevent any complications which might arise out of a second marriage, the plan was devised which was finally adopted. This argument ignores two prominent factors in this case. The first is Patrick J. Corvin. The second is the plaintiff. The former held the legal title to the property, and the latter was afflicted with an appetite for drink, which threatened her ruin. It is no more reasonable to suppose that Patrick J. Corvin would quietly have devested himself of the title to his real estate because of the possibility of his remarriage after the death of his wife, than it is to assume that, in the face of the daughter's acknowledged infirmity, the parents wished to assure her of the means with which to hasten and complete her moral ruin. It is much more consonant with human experience and reason to be-

lieve that these simple people, whose modest means were the fruit of years of toil and self-denial, became convinced that the welfare of their daughter, as well as a desire for a proper use of their hard-earned estate, demanded that it should not be left to the daughter. Under these circumstances it is not unnatural that these consistent Catholics should have bethought themselves of the church. To us who look at this disposition of property in the light and perspective of past events, it is not difficult to see how all that these parents may have desired could have been accomplished with a more generous regard for the future of their child; but, as we have stated, we are dealing with questions of law and fact, rather than principles of moral philosophy. The feelings of these parents towards their daughter are shadowed forth by the frequent separations and apparent estrangements, caused by the latter's course of life, and find expression in the statement of the mother to Mrs. Doyle, "She has broken my heart, and has caused me to shed many bitter tears." The testimony and the conduct of Father Hughes also bear witness to this view of the transaction with the church. There is nothing in the case upon which to base the assumption that Father Hughes, or any one else representing the church, urged this disposition of the property upon the Corvins. On the contrary, the attitude of Father Hughes was precisely what would have been expected of a clergyman who has a proper appreciation of the dignity and responsibility of his office. He warned the Corvins of the seriousness of the step they were about to take, and yielded to their requests only when it would have seemed a dereliction of duty to the church to persist in a refusal. This, of course, assumes the truth of his testimony. And why should we not indulge in this assumption? Father Hughes, although unknown to us personally, appeared to be a fair and credible witness. He is apparently a creditable representative of the clergy of the church to which he belongs. To refuse to believe his uncontradicted evidence in the light of the history of this case would mean that he is worthy of less credence than the average lay witness. Let us hope, for the honor of the clergy, as well as the judiciary, that no such invidious distinction may ever find its way into the rules of evidence.

It remains, then, to inquire whether a trust was impressed upon this property at the time of its original purchase by Patrick J. Corvin for the benefit of the plaintiff, and whether the defendants, the church and Lizzie J. Corvin, took the property charged with notice of that trust. In the discussion of these questions it will be assumed that, if a valid trust was ever created, it was never annulled; and that, if the said defendants took title with notice of the existence of such trust, the trust prevails. Was there such a trust? The answer to this question must be found in the evidence relating to the circumstances under which the property was purchased; and in the contemporaneous and subsequent declarations of the Corvins with reference to the title to said property. The circumstances which antedate the purchase of the property, and which are relied upon to establish a trust in favor of the plaintiff, are, as above stated, that the Corvins and their daughter resided together, the mother and daughter doing

the household work, which included that incident to the keeping of two or more boarders, and, possibly, some table boarders; and the father following his duties as a policeman at a salary of $1,000 per year. The mother had about $7,500 in United States bonds, and the daughter had $1,385 in bank, which is said to have been paid to her for services in assisting her mother. According to the testimony of the plaintiff's husband, there was a conversation between the plaintiff and her parents in 1875, in the course of which the latter told the former that, if she would draw her money out of the bank, and give it to them, they would purchase a house for a home, where they would all live until the parents' death, and then the plaintiff would have the house; that the plaintiff expressed her satisfaction with the proposed arrangement, and drew her money out of the bank, and gave it to her father. At this time there was talk of buying a house in Broome street, but, owing to an alleged defect of title, the purchase was not made. No purchase was made until 1880, when the property in suit was bought. During this interval of five years Patrick J. Corvin was continually on the lookout for a suitable place, and kept the moneys paid over to him by the plaintiff. When this property was bought, the conversation of 1875 was substantially repeated. The testimony of Leary, the plaintiff's husband, is corroborated by that of the witnesses Galvin, McCollum, and Andrews. Mrs. Galvin testifies: That about two years before the purchase of the East Broadway property Patrick J. Corvin told her that his daughter Rose had given him her money to purchase a home. That in stating what he said to his daughter he repeated to Mrs. Galvin: "You give it to me, and we will buy a home. We will have it, and you can keep it when you won't be as well able to work as you are to-day." Mrs. Galvin testifies to another conversation with Mr. Corvin in 1886. It seems that at this time the plaintiff was living in Brooklyn, where the witness visited her. She brought the plaintiff's sick child to its grandparents, the Corvins. Mrs. Galvin says she told the Corvins that they should have Rose back there. In reply to this Mr. Corvin said: "She left of her own care, and she shall not come back here;" and then Mrs. Corvin said: "Yes, dad; she will come back;" and he said: "No, she won't," to which Mrs. Corvin rejoined: "Yes, she will come back. She has as much right to this house as you have. There is $1,300 of her earned money in this house, and it is hers after we leave it." Corvin said: "You gave her the money," and Mrs. Corvin replied: "Yes, I gave her the money, I admit, but she helped me to earn it, and when she gave it to you she was married, and it was as much her husband's as it was hers." Thereupon Corvin said: "Well, just as you say; that is right. I put the money there, and what you say is right." Mrs. Andrews testifies that she talked with the Corvins both before and after the purchase of the East Broadway house. The first talk was just before they bought it. They (Corvins) said "they wanted to accommodate the invalid mother and sister of Mrs. Corvin, and have a home for Rose when they should die." After they lived in the house the Corvins said "they were so glad they had a home of their own, and that Rose would have it after their death." It is obvious that these several declarations contain no

words which, in their literal meaning, import a trust. Hence we must look to the surrounding and antecedent circumstances for the meaning which is to be given to the words. It may be well to note in passing that the learned counsel for plaintiff do not claim that the declarations of the Corvins are, in and of themselves, sufficient to create a trust; on the contrary, their claim is that "equity raises a trust out of the confidential relation between plaintiff and her parents, and the transactions between them." In considering the circumstances in which these declarations were made the court is not required, or even permitted, to adopt, without reservation, the uncontradicted statements of witnesses as to these circumstances, when such statements are at variance with the real truth, as shown by other circumstances and conditions. It is stated, for instance, that the moneys furnished for the purchase of the property by Mrs. Corvin and the plaintiff are moneys which they had earned. These statements are uncontradicted, but the circumstances show that they are only partially true. If it had been said that it was money which Mrs. Corvin and her daughter had helped to earn, it would have been literally true. It would be absurd to argue that in a frugal family like this the husband's salary of $1,000 per annum was wholly dissipated, while the $7,500 of United States bonds held by the wife and the $1,385 of money on deposit in the name of the daughter represented their earnings and savings in keeping a few boarders. That is so at variance with human experience as to make it incredible. The circumstances under which the plaintiff's bank accounts were opened and closed also serve to throw doubt upon the story that the money deposited was paid to her for services. Both accounts were opened at the same time. They were neither increased nor diminished in amount during the time they were kept open. They were both closed at the same time. The money withdrawn was thereafter, for a period of five years, kept by the father without objection. These facts render it quite probable that, for reasons best known to Corvin, he preferred to keep his savings in the names of his wife and daughter, rather than in his own name. But let us assume that the $1,385 given by the plaintiff to her father, and by him invested in this property, was actually her money, did the declarations of the father, under these circumstances, create a condition upon which equity will raise a trust? The title to this property was not obtained by the father under a false pretense, by which the plaintiff was misled, as in Lamb v. Lamb, 18 App. Div. 250, 46 N. Y. Supp. 219. It was not conveyed to the father under an agreement to hold for the plaintiff and her mother, as in Goldsmith v. Goldsmith, 145 N. Y. 313, 39 N. E. 1067. The father did not induce the plaintiff to let him take title under an agreement that he would afterwards convey to her, as in Wood v. Rabe, 96 N. Y. 415. It is alleged and shown here that the plaintiff did not know that the father had taken the deed in his own name. But the only arrangement testified to on behalf of the plaintiff contemplated that very thing. It was clearly understood that the father was to make the purchase and take the deed. If we accept as true the statement that the moneys with which the property was purchased belonged to the mother and daughter, what becomes of the

mother's interest? She paid all but $1,385 of the purchase price; yet there is no suggestion of a trust in her behalf, and no objection because the deed was in her husband's name. The declarations made by the Corvins at and after the purchase were simply such statements as would naturally be made by a father and mother with whom the acquisition of a house for themselves and their children is the highest ambition in life. At the time when these statements were made the Corvins undoubtedly thought and hoped that this property would furnish them a home during their lives, and would be an inheritance for their only child. That was all that was implied in these statements. Subsequent events changed the view of these parents as to the future of their daughter, and, however much we may disagree with them as to the wisdom of their course, we cannot make this the pretext for taking from them their inalienable right to dispose of their property as they thought best. There are circumstances which lend weight to the view that the claim of the plaintiff by virtue of an alleged trust, which grew out of the original purchase, is simply an afterthought. No such claim was ever made by the plaintiff during the lifetime of her parents, although she must have known that the title to this property was in her father's name. Family dissensions, which arose in part on account of her habits and in part because of disagreements between her mother and her husband, led to frequent periods of separation of varying duration. The husband paid rent for the apartments occupied by him and the plaintiff in this property, and ran deeply into debt for plaintiff's care and treatment at the House of the Good Shepherd during her frequent lapses from sobriety, but never a word is uttered or heard about any interest of the plaintiff in this house. It seems clear, therefore, that the plaintiff has failed to establish a trust in her favor. "While a trust may be implied from acts or words of the person alleged to have created it, to establish it there must be evidence of such acts or words on his part as that the intention to create it arises as a necessary inference therefrom, and is unequivocal." Wadd v. Hazelton, 137 N. Y. 215, 33 N. E. 143. "The settlor must transfer the property to a trustee, or declare that he holds it himself in trust, and the acts or words relied on must be unequivocal." Young v. Young, 80 N. Y. 422. If we were to assume that the plaintiff did not know that her father took the title to the property in his own name, she would be in no better position than she is. Section 53 of the statutes relating to uses and trusts is only intended to operate as a protection to persons paying the consideration for a conveyance of property, "when the alienee named in the conveyance has taken the same as an absolute conveyance in his own name, without the consent or knowledge of the person paying the consideration, or where such alienee, in violation of some trust, shall have purchased the lands so conveyed with moneys belonging to another person." It is plain that the plaintiff has not brought herself within this saving clause, which, in cases therein enumerated, preserves the right to resulting trusts.

In view of our conclusion as to the existence of any valid trust herein, we deem it unnecessary to discuss the questions whether the defendants, the church, and Lizzie J. Corvin, took title for value, and

without notice. It may be added, however, in referring to this subject, that there is not the slightest evidence that either of them knew of any trust which grew out of the original purchase of the property. The interviews between the plaintiff and Father Hughes, after the transfer to the church, and the plaintiff's long delay in seeking relief, would add an interesting chapter to this discussion. But, in the view which we take of this case, this would simply serve to lengthen an opinion which, we fear, is already too long. For the reasons above given, the plaintiff's complaint must be dismissed upon the merits, with one bill of costs to the defendants, and the usual allowance.

Complaint dismissed, with costs.